524 So.2d 182 (1988)
Shirley Mae CALLOWAY, Individually and as the Natural Tutrix of the Estate of Her Minor, Infant Calloway
v.
The CITY OF NEW ORLEANS, Criminal Sheriff for the Parish of Orleans, Jane Doe, Charity Hospital of Louisiana at New Orleans, Dr. John Doe, Nurse Mary Doe, ABC Insurance Company and XYZ Insurance Company.
No. CA-8835.
Court of Appeal of Louisiana, Fourth Circuit.
April 12, 1988.
*183 T. Allen Ursy, Bruce S. Johnston, Ursy & Weeks, Ivor A. Trapolin, L. Kevin Coleman, T.A., Miles G. Trapolin, Trapolin & Coleman, New Orleans, for defendants/appellants.
H. Muldrow Etheredge, Law Offices of Owen J. Bradley, and Sherman F. Raphael, J.D., New Orleans, for plaintiff/appellee.
Before GULOTTA, C.J., and LOBRANO and WARD, JJ.
LOBRANO, Judge.
In this wrongful death action, plaintiff, Shirley Calloway, was awarded $150,000.00 for the premature birth of her daughter who lived approximately 36 hours. Defendants are the Louisiana Department of Health and Human Resources (Charity Hospital at New Orleans), and Charles C. Foti (Foti) in his capacity as Criminal Sheriff for the Parish of Orleans. Both defendants were found liable in solido, and both appeal.
The facts giving rise to this appeal are essentially as follows:
Plaintiff, Shirley Mae Calloway was arrested for shoplifting on January 3, 1983. At that time, she was approximately six months pregnant. She was booked into central lockup at the Orleans Parish Prison at about 10:30 p.m. She told the booking deputy that she was pregnant and was having abdominal cramps. Deputy Moore, the booking deputy, remembers her being six months pregnant. Calloway was then placed in a holding cell with other female prisoners. She continued to complain about pain and bleeding or possible spotting. A 3:13 a.m. entry in the Communications Log Book by Deputy Moore states that Calloway appeared to be hemorraghing, and a corpsman was notified. At 3:14 a.m. a female corpsman came to examine Calloway. The examination consisted of Calloway lowering her underwear and the corpsman shining a flashlight on her underwear to see any sign of blood. This was done in the holding cell with the other female prisoners present. The corpsman's log entry indicates there was no evidence of bleeding, and that Calloway would be seen by a nurse in the morning. Subsequently, Calloway was removed from the holding cell for fingerprinting. She testified she told the deputy who fingerprinted her that she was having labor pains. At 10:10 a.m. Calloway was brought to see a nurse. She was complaining of severe abdominal cramps and pain. The nurse found no evidence of bleeding. No vaginal exam was performed at any time.
Calloway was then transferred to Charity for further evaluation and treatment. She was handcuffed with her hands in front of her body. The deputy took her to the emergency room on the first floor of Charity. They then went to the obstetrics admitting office located on the tenth floor. *184 During the admission procedure the head nurse in the labor and delivery unit saw no signs of labor or bleeding. Calloway stated that she was in pain, but was not bleeding. As part of the regular admission procedure, the nurse asked for a urine specimen. Calloway complained to the nurse that she was in too much pain to give a specimen. The deputy accompanied Calloway into the bathroom. The deputy stated that she removed the handcuffs. Calloway and a nurse stated that she remained handcuffed. When she sat down on the toilet she felt a lot of pain and screamed that her baby was coming. Two nurses rushed into the bathroom and brought Calloway out. When they attempted to lift her onto a gurney the infant was delivered spontaneously and fell onto the floor, striking its head. Calloway and the infant were rushed to the delivery room. The deputy removed the handcuffs so that the doctors could care for Calloway. The infant was immediately taken to the Neo Natal Intensive Care Unit for treatment. It weighed only two pounds, four ounces and was delivered during the 28th week of gestation. Calloway was taken to a hospital ward.
Initially Calloway did not want to see the infant. She changed her mind and saw the infant only once for a brief period of time. The infant died within 36 hours due to complications arising from its prematurity. Calloway remained in the hospital for a few days for observation then was returned to Orleans Parish Prison.
Prior to the events in January 1983, Calloway made two visits to Charity. The first one was on November 28, 1982. She was having heavy bleeding and a vaginal discharge. She was given some medication and told to report to the L.S.U. Prenatal clinic for additional care. She did not go. She returned to Charity on December 24, 1982, again complaining of heavy bleeding. She was told to get bed rest and to report to the L.S.U. Prenatal clinic as soon as possible. She did not go. Blood tests performed at that time showed her to be anemic and having contracted syphilis. Other than these two visits to Charity, there was no evidence of additional prenatal care in the record.
The trial judge held Charity responsible for the negligent acts of its corpsman in treating plaintiff, and the Criminal Sheriff responsible for the negligent acts of his employees.
Foti asserts the following:
a) The claim against him has prescribed.
b) The judgment was based on speculation and conjecture, and there was no showing of negligence on his part.
c) The award is excessive.
Charity appeals asserting the following errors:
a) The trial court incorrectly applied a hospital standard of care to the prison corpsman.
b) There was no evidence submitted to establish a standard of care for a prison corpsman.
c) There was a lack of causation between the actions of the corpsman and the premature birth.
d) The damage award is excessive.
We discuss each defendant's argument separately.
CRIMINAL SHERIFF
a) Prescription

Foti's prescription argument is predicated on the following chronology.
Plaintiff's original suit was filed January 5, 1984. In that petition, she alleges that during her ordeal at Charity she was at all times handcuffed in a "behind the body position." Each allegation in that original petition refers to the position of the handcuffs, and the conclusion that plaintiff was helpless to prevent the child from falling on the floor.
On January 27, 1987, plaintiff amended the petition to allege the Sheriff failed to provide adequate medical care at the prison. She further alleged that the faulty medical care resulted in the premature birth and subsequent death of her child.
Foti argues that the 1987 amendment states a completely new cause of action against him, and thus has prescribed since the incarceration was January 1983. In support thereof, he cites Neilson v. Jefferson *185 Parish Sheriff's Office, 242 So.2d 91 (La.App. 4th Cir.1970), and Gates v. Hanover Insurance Company, 218 So.2d 648 (La.App. 4th Cir.1969).
We disagree. First, both Neilson and Gates, supra, deal with amending a petition pursuant to Code of Civil Procedure Article 934, and an interpretation of that article. Neither case decided the issue of prescription.
A prescription plea directed at a supplemental or amended petition is resolved by the interpretations of Code of Civil Procedure Article 1153. That Article provides:
"When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the filing of the original pleading."
The interpretative jurisprudence of the above article emphasizes two factors. First, whether the original suit provides sufficient notice to the defendant and, second, the operative facts surrounding plaintiff's claim. In Gunter v. Plauche, 439 So.2d 437 (La.1983), our Supreme Court set forth these guidelines:
"It is well established that Art. 1153 permits amendment despite technical prescriptive bars where the original pleading gives fair notice of the general fact situation out of which the amended claim arises." Id. at 440.

The Court went on to state:
"Louisiana's Code of Civil Procedure abolished the `theory of the case' restriction on pleadings. (citation omitted) Article 1153 requires only that the amending petition's thrust factually relate to the conduct, transaction, or occurrence originally alleged." Ibid at 440.

When the original petition in this case was served on Foti he knew that a claim was being made for his alleged negligence in the care and handling of plaintiff subsequent to her arrest. Although the facts which allegedly form the basis of that negligence are different in the amending petition, we hold they satisfy the requirements of Article 1153 and thus relate back to the filing of the original petition. Prescription did not toll. See, Giroir v. South Louisiana Medical Center, 475 So.2d 1040 (La.1985).
b) The Criminal Sheriff's Negligence

Foti argues that the trial court based its judgment on speculation and conjecture, and that there was no evidence of his negligence. In support of the first argument, Foti quotes a portion of the trial court's judgment wherein he states:
"No one can definitely say whether or not if proper treatment were given herein, whether or not the plaintiff would have had the miscarriage. This is medical conjecture of whether or not any type of drug could have been administered to the plaintiff and would it have successfully stopped the labor from going forward and would have stopped the plaintiff from having a premature birth of a child? No one knows that and we cannot definitely say that."
In essence, Foti's argument is lack of causation. He asserts that because there is no proof that plaintiff's premature birth could have definitely been prevented, the essential "but for" element of a negligence case is missing. We disagree.
The record shows that tocolytic agents are administered to patients threatening premature birth. Dr. Victor Brown, an expert qualified gynecologist, testified that he has been successful more than half the time in preventing premature births with the use of tocolytic agents, particularly Pitrodene. He also stated that, "[a] better way to look at the problem would be to see how much longer you can keep the baby inside of the mother giving it as much chance to grow." He opined that, given plaintiff's condition and complaints, a pelvic examination should have been done.
Plaintiff's proof is by a preponderance of the evidence. She does not have to prove an absolute certainty. The reasons of the trial judge, when read in their entirety, indicate he felt that there was no absolute medical certainty premature birth could be prevented. However, it is reasonable to *186 conclude that, based on the evidence presented, the "but for" of this case is Foti's failure to timely transport plaintiff to Charity where the tocolytic agent could be administered. Thus, there is more than speculation and conjecture forming the basis of the trial court's conclusion.
Foti argues, however, he fulfilled his obligations under the law by contracting with Charity to provide medical services to the prisoners in his custody. In support thereof Foti submits that Louisiana law provides that the standard of care imposed upon a confining authority in providing medical needs of inmates is that the services be reasonable, citing Elsey v. Sheriff of Parish of East Baton Rouge, 435 So.2d 1104 (La.App. 1st Cir.1983), writ denied 440 So.2d 762 (La.1983).
We agree with the argument that the Sheriff must provide reasonable medical services to his inmates. However, the record is clear that Foti's negligence is not predicated on incompetent medical services, but on his failure to follow his own established procedures. Those procedures, contained in the Sheriff's policy manual, and referred to as Post Orders, provide, in part, that a pregnant female who has obvious vaginal bleeding or who states she is experiencing bleeding, or who complains of abdominal pain should not be accepted at the Central Lock-up. We conclude that this standard, even if it were not contained in the Post Order, is what the "reasonable man" custodian of incarcerated persons should do under those given circumstances. It is certainly foreseeable that a pregnant female suffering the symptoms outlined above would be exposed to a risk of serious harm to herself and her child if incarcerated without medical attention.
Deputy Moore, the booking officer, testified she knew plaintiff was six months pregnant at the time of her arrest. Plaintiff testified she complained of abdominal cramps at that time and later when she was fingerprinted. Deputy Moore's entry in the log book at 3:13 a.m. indicated plaintiff "appeared to be hemorrhaging." Although a corpsman examined plaintiff at 3:15 a.m., and despite plaintiff's complaints, she was not seen by a nurse until 10:30 a.m. whereupon she was transported to Charity.
Foti argues that because the corpsman did not see any vaginal bleeding at 3:15 a.m., there was no indication of premature delivery to necessitate further action. The fact is well established, however, that not until 12 hours after incarceration did plaintiff see a nurse who immediately had her transported to the hospital. It is also established that the Sheriff's employees knew plaintiff was pregnant and complained of abdominal pains. She was first seen by a corpsman 5 hours after her incarceration who did nothing more than examine her underpants with a flashlight for evidence of spotting. She was transported to the hospital seven hours later.
We conclude that this evidence preponderates in plaintiff's favor. Knowing the condition of plaintiff, the Sheriff's Office was negligent in failing to transport her to Charity sooner.
CHARITY HOSPITAL
a) Standard of Care

Charity argues that the trial judge incorrectly applied a hospital's standard of care to the prison corpsman. In support thereof they also cite Elsey v. Sheriff of Parish of East Baton Rouge, supra, for the proposition that prison hospital care must be adequate or reasonable. They further urge that no evidence was introduced to establish a standard of care for a prison corpsman, therefore plaintiff failed to show any breach of duty.
Plaintiff's action is one of negligence. She asserts that Charity's medical personnel at Central Lockup were negligent in their treatment of her. The trial court's reasons make it clear that the basis of his decision against Charity is the negligence of its medical personnel assigned to the prison. As in all negligence cases, the responsible party must have breached a duty which encompasses a foreseeable risk of harm to the plaintiff.
*187 In Elsey, supra, cited by both Foti and Charity, our brethren of the First Circuit explained:
"This duty to provide reasonable medical care for prisoners does not require the maintenance of a full hospital at the site of each prison in order to protect against every medical risk, but does encompass the risk that an inmate will become sick or be injured and require life-saving attention."
Id. at 1106.
While we agree with Charity that a corpsman should not be held to the same standard of care as a medical doctor, we do believe his standard is above that of any ordinary layman. Medical care requires some degree of professional skill. La.R.S. 40:1299.39 provides that the standard of care of every health care provider shall be to exercise the same degree of skill required by others licensed in his profession in the community.
The evidence shows the following facts. The Supervisor of the medical personnel who worked at Parish Prison testified that the education of a corpsman is similar to that of an ambulance attendant. He also testified that they (the medical personnel) were required to follow the prison guidelines noted earlier in this opinion.
The evidence further suggests that the extent of the examination performed by the corpsman at 3:15 a.m. was to flash a light on plaintiff's underpants so that she could check for spotting. The log book entry indicates there was no evidence of bleeding or spotting, but that plaintiff was to be seen by a nurse. Seven hours later the nurse immediately transfers plaintiff to Charity.
Charity argues that, absent evidence of spotting, the corpsman was not required to do anything further. In support, they cite the medical testimony which indicates that spotting is a symptom of premature labor. However, the medical testimony is equally convincing that pregnant women with complaints of abdominal pains, but no spotting, may also require hospitalization. Dr. Brown also opined that a sure test to determine the onset of labor is a pelvic examination, which was never performed on plaintiff.
We are satisfied that there was no manifest error in the trial judge's ultimate conclusion that the prison medical personnel were negligent. As stated earlier, their standard of care is above that of the layman. Given the fact of plaintiff's obvious pregnancy, her persistent abdominal pains, the very minimal examination by the corpsman at 3:15, and the fact that plaintiff was not seen by a registered nurse until 12 hours after incarceration, we conclude plaintiff's treatment by Charity personnel at the prison was below the standard of care required.
Charity further argues the issue of causation. Their argument is similar to that of the Criminal Sheriff. Had the prison medical personnel timely transported plaintiff to Charity, it is reasonable to conclude that proper medication would have prevented a premature delivery.
PLAINTIFF'S OWN NEGLIGENCE
Both defendants argue that plaintiff's failure to obtain prenatal care, and her contraction of syphilis during pregnancy were causative factors in the premature birth.
We disagree. The evidence does not suggest these factors caused the premature birth. The thrust of plaintiff's claim is that the premature delivery could have been prevented had it not been for the negligence of the Sheriff and Charity. As previously noted, the evidence does support this conclusion. The evidence does not suggest plaintiff's lack of prenatal care caused the premature delivery.
DAMAGE AWARD
Both defendants argue that the $150,000.00 award is excessive. While we agree that the law requires each case to be decided on its own peculiar facts and circumstances, our initial inquiry is whether the trial judge abused the much discretion afforded him under Civil Code Article 1999. Coco v. Winston Industries, Inc., 341 So. 2d 332 (La.1977).
*188 After a review of the particular facts and circumstances of this case, we agree that the award is an abuse of discretion.
The award was for plaintiff's grief at the loss of her child who lived approximately 36 hours. She reluctantly saw the child only once during that time. Although plaintiff argues she was handcuffed at the time of delivery, and leg-cuffed to the bed after delivery thus adding to her grief and personal loss, the evidence also shows that prior to her arrest plaintiff refused to seek medical attention and pre-natal care, and that she was treated for syphilis during the fifth month of her pregnancy.
We determine that an award of this type is predicated on the bond between parent an child. Taylor v. Charity Hospital of Louisiana, 466 So.2d 736 (La.App. 4th Cir.1985), vacated on other grounds, 476 So.2d 338 (La.1985), writs denied, 476 So.2d 341 (La.1985). Presumably the longer a child lives, the greater the parental bond, and the greater the loss upon the child's death.
Satisfied that the award is excessive, our function is to lower it to the highest reasonable amount. Reck v. Stevens, 373 So.2d 498 (La.1979). While conscious of the Supreme Court's admonition in Reck, supra, we have reviewed prior awards in similar cases.
In Searcy v. Porter, 381 So.2d 540 (La. App. 2nd Cir.1980), the parents brought an action for the wrongful death of their 3 month old infant. The child was severely injured in an automobile accident and died 8 hours later. The court found that the facts and circumstances showed a great deal of love and affection existed between the parents and child. The court awarded the mother $50,000.00, and the father $40,000.00 in general damages for the wrongful death of their child.
This court, in Moran v. Dean, 416 So.2d 351 (La.App. 4th Cir.1982), stated that in determining damage awards for the negligent death of an infant, consideration should be given to the age of the child, the mental anguish of the parent, and the loss of future love and companionship. In that case the infant lived only two hours. The mother was awarded $40,000.00 for the mental anguish and loss of future love of the child. That award appeared to be "reasonable and appropriate." Moran, supra at 356.
In Taylor v. Charity Hospital of Louisiana in New Orleans, 466 So.2d 736 (La. App. 4th Cir.1985), this court awarded $25,000.00 to the mother of a six year old girl who died in the hospital. In that case, we stated that "there is no strict standard for making this determination (of damages) and the award will hinge upon the relationship between the child and the parent(s) before death." Taylor, supra at 740.
In the case presently before us, there was little evidence presented to show the relationship between the mother and child, or her concern for the infant's well being. The infant lived less than two days. Calloway saw the infant once during that time, and only for a brief period. Before her arrest she showed little concern for prenatal care. She did not follow the doctor's orders for further checkups and bed rest. Medical experts at trial expressed their concern for the physical condition of the plaintiff due to her various ailments. The only evidence establishing any mental pain or anguish was the plaintiff's own testimony. Considering the above facts, and based on a thorough examination of the record, we hold that the trial court's damage award of $150,000.00 is excessive and an abuse of its discretion. The award will be reduced to $30,000.00.
DECREE
For the reasons assigned, the judgment of the trial court is affirmed as to the liability of the Criminal Sheriff of Orleans Parish, and the Louisiana Department of Health and Natural Resources. However, the award of damages is reduced to $30,000.00, plus legal interest from date of judicial demand.
AMENDED, AND AS AMENDED AFFIRMED.