LOTTINGER, Chief Judge.
This is a tort action brought by the parents of a thirteen year old child, Eric Scott Payne, who hung himself while in the custody of the Baton Rouge City Police Juvenile Detention Center. The parents of the deceased child seek damages for wrongful death and also bring a survival action on behalf of their child. The following governmental entities were named as defendants in the suit: the State of Louisiana, the Parish of East Baton Rouge, the City of Baton Rouge and the Baton Rouge City Police Department. After a trial on the merits, the presiding judge ruled in favor of the defendants and the plaintiffs appeal that ruling.
FACTS
On or about January 27, 1989, Eric Scott Payne was in the custody of the Baton Rouge City Police Juvenile Detention Center. The record is not clear as to how long Eric had been at this facility or as to what acts led to his confinement; these facts are not relevant to the issues presented by this appeal.
The testimony at trial reveals that the facility at which Eric was residing had four levels of incarceration, Units A through D. In Unit A, juveniles are given the most freedom, while in Unit D, the least. Eric was, on the night of his death, housed in Unit C. The policy of the facility, with respect to juveniles in Unit C, was to require the juveniles to remove their pants and shoes and place them on the floor of the hallway directly opposite the door to their room before being confined to their room. The physical layout of- the section of Unit C in which Eric was incarcerated consisted of one wide hallway with doors entering into the individual rooms on each side of the hallway. Running down the center of the hallway was a solid brick wall, thus forming two individual hallways with a connecting opening at each end. Testimony at trial by witnesses employed at the facility established that the policy of removing pants and shoes was intended to prevent the juveniles from harming themselves with articles of clothing. These witnesses included two attendants that were on duty that evening, Joe Knight and Clarence Gordon, Jr., and Lieutenant Jerry Gardiner of the Baton Rouge Police Department, who is the commander of the facility. The testimony of these three witnesses also established the fact that employees of the facility were aware that, due to a gap of approximately four inches between the door to each room and the floor, juveniles were able to retrieve articles from the hallway floor through a process referred to as “fishing.” The juveniles *1055 would “fish” articles from across the hallway by tying a knot in their bed sheet and swinging it across the floor under the door until they “hooked” the desired article. They would then pull the article across the hall, under their door and into their room.
On the evening of Eric’s death, at approximately 7:00 p.m., Eric was placed in his room early, or “put down,” in response to what attendant Joe Knight’s report referred to as “horseplay.” In the same section of the facility another detainee, Jimmy Hudson, had been “put down” previously and therefore, was in his own, separate room when Eric arrived. It was Jimmy Hudson’s testimony that both he and Eric, by screaming loudly under the doors and into the intercom/monitoring system located on the wall of each room, informed Joe Knight that they were suicidal and requested they be placed in the observation room near the attendants’ post. The testimony in the record indicated that a television located near the attendants’ office could be viewed from the observation room. Mr. Knight testified that at no point in time did he become aware of threats of suicide from either Jimmy or Eric. Apparently, the trial judge chose to believe the testimony of attendant Joe Knight and this credibility determination will not be disturbed by this court. The trial judge also chose to believe the testimony of Joe Knight with respect to the question of whether or not the intercom/monitoring system remained on at all times relevant to this event. Jimmy Hudson testified that he could tell it had been turned off as the usual static or feedback was not present, whereas Joe Knight testified that the monitoring system remained on at all times and he heard nothing unusual. Again, this court will not disturb these credibility determinations.
Mr. Knight testified that he found Eric hanging from the ventilation grate above the sink in his room, at 8:55 p.m., suspended by a shoelace woven through and tied onto the grate and then tied onto a bed sheet which formed a noose around his neck. One of Eric’s shoes was found on the floor outside the door with the shoelace missing. It is apparent from photographs of the ventilation grate, submitted into evidence, that the openings in the grate were of such a small size that a narrow string was required to be woven through and tied to the grate in order to suspend the bed-sheet.
TRIAL COURT FINDINGS
The trial judge gave the following oral reasons for judgment, in pertinent part:
I don’t believe Mr. Hudson because looking at the total picture of what went on, from the record, he knew how to get into the isolation cell, he had been there several times himself. And that would have been a big point the night of the investigation, that would have been a big point if they had been trying to get attention, loudly screaming about committing suicide to get into that isolation room. Someone would have said something about that, I believe, that night of the investigation. Not one mention was made of that. Cashio does corroborate the story Hudson told the investigating officers, from the official report. Cashio was adjacent to Hudson’s room, I think Hudson was in 14 and Cashio was in 11, he was on the same side of the wall as Hudson.
Also, nobody mentioned in the report the detainee on the same side of the wall as Eric in room 3 heard the conversation too under the door, and no mention was made of any loud requests. They were talking, I get the impression, quietly and they devised this scheme to mimic a suicide to some extent.
So, I don’t believe Hudson from the circumstances presented in the record of this case, how he impressed me. That’s why I asked you why would he lie? He gave me no impression he wasn’t telling anything but what he remembered at the time the incident occurred.
Eric was in the care, custody and control of that detention center, no question. To me they had some pretty good routines going, they had attendants, they used some of the other boys that had less problems to float down the area. There were several statements about some of the other boys that checked on the four *1056 that were back in the back while the others were still at the church services or in the recreation area. Nobody mentioned any loud screaming or calling and trying to get attention.
Eric showed no sign whatsoever, in the record, to the officials that he was having any suicidal thoughts. He had mentioned to Danille Jones, according to the record, maybe the day before, that he was missing his parents, missing his home and was thinking. Nothing was reported to the officials in that regard. They had no idea that he was ever thinking about that, if in fact he was. His daddy had visited him two days before, said he was doing well and all the reports on Eric were pretty positive.
So how could this thing have been prevented? The only way I can see is if someone were walking by at the precise time Eric either slipped off the lavatory or the commode and the noose, unfortunately, tightened around his neck. If someone had passed and saw that possibly he could have been saved. That’s beyond, from the circumstances of this case, the duty of the detention center, in my opinion. I think they had regular checks, they had attendants on duty. There’s no evidence in the record that anything bad happened with shoestrings and suicide, there was no connection between the shoestring and suicide in the record. If they had had anything prior that indicated something like that then maybe they would have taken away the sheets and the shoestrings. Then what else? People, I guess, that want to commit suicide can do it in, I don’t know, so many different ways.
I can’t see a duty breached at the detention center in this case, I can’t see a breached duty. There were no standards of detention centers presented to the court in this record. I don’t have much to judge except what I heard in this case and it seems reasonable to me and I think the detention center was reasonable in their care and custody of this young man, who unfortunately killed himself. For those reasons the court denies the claim at plaintiff’s costs, will sign judgment accordingly.
DISCUSSION
We have found no Louisiana statutes or jurisprudence which articulate the duty of a penal institution with respect to preventing inmates from harming themselves. Therefore, we have reviewed the jurisprudence of other jurisdictions regarding this duty.
In 72 C.J.S., Prisons, § 78 (1987), the duty of prison officials is described generally as follows:
A prison official is under a duty to protect a prisoner from any harm which the prisoner may inflict upon himself, when such harm is reasonably foreseeable, and this includes preventing the prisoner from committing suicide.
As with self-inflicted harm generally, the suicide must be reasonably foreseeable to give rise to the duty and in the absence of actual or constructive notice of a prisoner’s suicidal predilection, there is no duty to prevent a suicide. Conversely, when a suicide is reasonably foreseeable, the jailer should follow procedures that are sufficient to prevent the prisoner from killing himself.
This rule applies whether a prisoner is mentally anguished, helplessly intoxicated, or temporarily insane because of conditions forced upon him by the jailer. Enacting protective regulations.
As a means of minimizing the risk of suicide, regulations regarding the equipment placed in isolation units used to detain potential suicides may be enacted. (Footnotes omitted).
In Jane M. Draper, Annotation, Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner, 79 A.L.R.3d 1210 (1977), the author describes the general duty as one of reasonable care to keep prisoners safe from unnecessary harm. When prison authorities know or have reason to believe that the prisoner might do harm to himself, they must use reasonable care to assure that such harm does not occur. Id. at 1214.
*1057 In Falkenstein v. City of Bismark, 268 N.W.2d 787 (N.D.1978), the North Dakota Supreme Court upheld a finding of liability against the City for the death of an inmate by suicide. The inmate was placed in a cell described as “the hole,” overnight, while intoxicated. The next morning the inmate was found dead, hanging from the cell bar doors with his T-shirt knotted around his neck. The court noted that most suicides are considered to be intentional acts and, unless it is foreseeable that the negligent act would cause suicide, recovery is unavailable. The court found the controlling factor to be, “whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself.” Id. at 791. The trial court did not decide the foreseeability question as a matter of law, instead leaving the mixed question of law and fact for the jury. The opinion notes that, “[witnesses for the City acknowledged that there is a rule that each prisoner is required to remove his belt, shoelaces, and necktie prior to being placed in a cell. The purpose of the rule is to prevent the prisoner from harming himself. ... Upon this evidence alone the jury could conclude that Kevin’s suicide was foreseeable.” Id. at 791. The court found that authorities owe a general duty of care to those who have been arrested and that the precautions which are reasonable depend upon the particular circumstances of the case. Id. at 792.
In Dezort v. Village of Hinsdale, 35 Ill.App.3d 703, 342 N.E.2d 468 (CA 2d 1976), the widow of a jail inmate who committed suicide sued the village and its police officers for negligently failing to prevent the suicide. The plaintiffs husband arrived home in the early morning hours intoxicated and threatening suicide. The decedent expressed these suicidal thoughts to the police verbally and physically by attempting to relieve the police officer of his weapon in order to use it to kill himself. The decedent was searched before being placed in a cell. Cigarettes, matches and a wallet were confiscated, but the decedent was allowed to keep his belt which he then used to hang himself. The trial court granted the defendant’s motion for summary judgment. The appellate court reversed and defined the duty owed to prisoners by prison authorities as follows: “they are required to exercise ordinary and reasonable care for the preservation of their prisoner’s health and life under the circumstances of the particular case.” Id. 342 N.E.2d at 473. The court further stated, “[t]hat a prisoner who is alone in a cell is likely under some circumstances to injure himself or to commit suicide would appear to be reasonably foreseeable.” Id. 342 N.E.2d at 471.
The Supreme Court of Arizona dealt with this vexing problem in Maricopa County v. Cowart, 106 Ariz. 69, 471 P.2d 265 (1970). Here, a juvenile detainee informed the detention home personnel that he wished to die. The juvenile then escaped from the home on two separate occasions and because of these escapes was confined to a cell twenty four hours a day. After two days in the cell, the juvenile hung himself with a bedsheet wrapped around a recessed light fixture. The decedent’s mother was awarded damages for the wrongful death of her child based on the jury’s determination that the detention center personnel breached a duty owed. The supreme court reversed, finding that the plaintiff had not proved that the defendant failed to conform to the standard of care required. Specifically, the court found that plaintiff had failed to prove the standard of care owed by institutions, such as a juvenile detention center, with respect to the supervision of juvenile detainees. The court stated: “Since the duty in this case is imposed because of the type of institution involved, the standard required for the protection of juveniles placed in its custody is that the institution exercises the skill and knowledge normally possessed by like institutions in similar communities handling juveniles.” Id. 471 P.2d at 267. The court observed that the evidence necessary to establish this standard includes the education and background of employees, the number of employees as compared to the number of inmates, the type of supervision, the activities of the inmates, the lack of or presence of supervisory personnel, the rou *1058 tine of personnel in checking inmates and the type of facilities where supervision can be conducted. As the plaintiff failed to establish a standard of care required in the supervision of the juveniles, recovery was denied.
In Hutchinson v. Miller, 548 So.2d 883 (Fla.App. 5th Dist.1989), the parents of a juvenile who committed suicide while incarcerated in a county jail brought suit claiming that their son’s death was due to the sheriff’s negligence. The trial court granted summary judgment in favor of the sheriff, relying on Guice v. Enfinger, 389 So.2d 270 (Fla.App. 1st Dist.1980), which held that the county sheriff was not liable for the death of an inmate who hung himself with his belt because such death was not a probable consequence of the failure to remove the belt, and thus was not foreseeable.[1] Hutchinson, 548 So.2d at 885. The Florida Court of Appeal reversed the trial court’s decision on the grounds that in that case, unlike Guice, there was evidence from which the trier of fact could have concluded that the harm to the decedent was foreseeable. Such evidence included “taunts of the other inmates, their physical and mental abuse of the decedent, coupled with his withdrawal, his crying and his written appeals for help via his request for a transfer_” Hutchinson, 548 So.2d at 885.
These cases indicate that in most jurisdictions, in order to recover for the negligence of prison authorities, the plaintiff must prove that the authorities knew or should have known that there was a risk that the inmate would harm himself and that they failed to take reasonable precautions to guard against such harm. In the absence of such proof the plaintiff is relegated to proving that the manner in which the facility was operated breached a standard of care owed by all such facilities and must put on evidence to that effect.
In the case at bar, the plaintiffs failed to put on any proof relative to the standard of care owed by facilities such as the Baton Rouge City Police Juvenile Detention Center. No proof regarding the types of precautions taken by other such facilities in the community was offered. Therefore, the plaintiffs may recover only if they are able to prove that the operators of the facility knew or should have known of the risk and failed to take reasonable measures to prevent the harm. The trial judge’s factual finding was that no threat of suicide was communicated by Eric to the facilities attendants. Thus, the plaintiffs are left with proving that the facility should have known that such harm could occur and failed to take reasonable measures to prevent the harm.
The plaintiffs in the instant case argue first that Louisiana law requires one who has custody of a child to exercise reasonable care to protect the child from injury, citing Freeman v. Wilcox, 303 So.2d 840 (La.App. 1st Cir.), writ denied, 307 So.2d 630 (La.1974). Plaintiffs then argue that a facility is negligent when it fails to follow its own policies. Plaintiff points to Calloway v. City of New Orleans, 524 So.2d 182 (La.App. 4th Cir.), writ denied, 530 So.2d 84 (La.1988), as authority for that proposition. In Calloway, a pregnant woman who complained of abdominal pain was placed in a holding cell and did not receive medical attention for a period of twelve hours. The sheriff’s policy was that no pregnant woman complaining of abdominal pain was to be accepted. The sheriff was held to be negligent and assessed damages for the premature birth and death of the plaintiff’s child. The plaintiff in this case argues that the Baton Rouge Juvenile Detention Center had a policy that children held in Unit C were to have their pants and shoes removed before being placed in their room. Plaintiff argues that the fact that the attendants, and the administrator, of the facility knew that the children were able to gain access to their shoes and pants by “fishing” them out of the hallway is in essence a violation of the facility’s own policy to remove these articles.
*1059 The City-Parish argues that they can only be found liable for a suicide if the plaintiff proves that Eric communicated to the facility authorities his intent to commit suicide and the authorities then failed to act reasonably. They further argue that, if any negligence is found on their part, it is superseded by the child’s negligence in that he acted in gross disregard of his own safety in light of a known risk. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (La.1985).
In Louisiana, in order to recover under La.Civ.Code art. 2315, four inquiries must be answered affirmatively. Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982) writs denied, 427 So.2d 439 and 429 So.2d 127, 134 (La.1983); Dixie Drive It Yourself System New Orleans Company v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962). See also Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). First, did the defendant owe a duty to the plaintiff? Second, was this duty breached? Third, was the breach of this duty a substantial factor in bringing about the harm to the plaintiff, i.e., was it a eause-in-fact of the harm which occurred? And lastly, do the risk and the harm encountered by the plaintiff fall within the scope of the protection afforded by the duty breached?
We must first decide if the City-Parish owed a duty to Eric. Based on the jurisprudence cited above, we find that prison authorities owe a duty to use reasonable care to protect inmates from harm and that this duty extends to protecting inmates from self-inflicted injury. This duty is not absolute, but depends upon the circumstances of the particular case. The City-Parish also owes a duty to juveniles who are in their custody to use reasonable care to protect them from harm.
In order to determine if the duty to use reasonable care was breached, we must evaluate the actions of the detention center personnel in light of the circumstances that existed at the time of the alleged negligence. The policy of the detention center in removing the shoes and pants of the inmates was designed to prevent the detainees from gaining access to articles of clothing which posed the greatest risk of harm. The detention center personnel acknowledged that the purpose of removing the articles was to prevent the detainees from harming themselves while in solitary confinement. The personnel also admitted at trial that they were aware the detainees could easily gain access to the articles by “fishing” with their sheets.
Plaintiffs failed to prove the standard of care to be used by the detention center. There is no evidence of any standard which required the removal of articles of clothing, including shoes, absent some indication of possible self-inflicted harm. If the detention center had allowed this deceased to keep his shoes and pants, and yet the suicide still had happened, under the facts of this case there would have been no breach of a duty to exercise reasonable care. We find no legal difference merely because the shoes were removed and placed in a position whereby the deceased could retrieve them.
Therefore, the judgment of the trial court is affirmed at plaintiffs-appellants’ costs.
AFFIRMED.

. The Guice court based its decision on the fact that the decedent at no time indicated any outward signs of suicidal tendencies and thus, the court considered the acts of the decedent to be an independent, intervening cause.