PISA SCHWENKE and SINA SCHWENKE, parents of Raymond
Tauese Schwenke; and BROTHERS and SISTERS of Decedent
Raymond Tauese Schwenke, Schwenke, and PISA SCHWENKE,
as Representative of Decedent's ESTATE, Plaintiffs

v.

AMERICAN SAMOA GOVERNMENT
and TOLEAFOA LEIATO, Defendants

High Court of American Samoa
Trial Division

CA No. 23-97

January 12, 2000

Before RICHMOND, Associate Justice, ATIULAGI, Associate Judge, and TAUANU`U, Temporary Associate Judge.

Counsel: For Plaintiffs, Salaonoa Aumoeualogo Soli
　　　　For Defendant, Gwen J. Tauiliili-Langkilde, Assistant
　　　　Attorney-General

## OPINION AND ORDER

Plaintiffs are the parents, brothers, and sisters of decedent Raymond Tauese Schwenke ("Raymond"). They sued defendants American Samoa Government ("ASG") and Toleafoa Leiato ("Leiato") for damages. They allege that ASG's employees were negligent in failing to protect Raymond from committing suicide while Raymond was a prisoner at ASG's Correctional Facility ("CF"), and that this negligence was the proximate cause of Raymond's death.

Plaintiffs are pursuing their cause of action under the Government Tort Liability Act, A.S.C.A. §§ 43.1201-.1213. This act provides for an exclusive remedy against ASG and insulates ASG's officers and employees acting within the scope of their employment from suit. A.S.C.A. § 43.1207. Leiato, who was the CF's warden at the time of Raymond's death, was such an employee. Thus, on June 8, 1998, on ASG's motion and with plaintiffs' concurrence, the Court dismissed the action against Leiato.

The case proceeded to trial on August 19 and 20, 1999. At the beginning of the trial, ASG raised the sufficiency of plaintiffs' designation of Raymond's next of kin in wrongful death actions, as required by A.S.C.A. § 43.5001(b). Although the case caption is general, the body of the complaint does identify Raymond's parents, Pisa Schwenke ("Pisa") and Sina Schwenke ("Sina"), and siblings, Pisa Pisa, Jr. ("Pisa, Jr."), Joanna Levi ("Joanna"), Henry Schwenke ("Henry"), Jerry Schwenke ("Jerry"), Sulusi Schwenke ("Sulusi"), Siulagi Schwenke ("Siulagi"), and Afele Schwenke ("Afele"). No evidence of other next of kin was presented during the trial. Thus, we hold that the designation of Raymond's next of kin is sufficient for purposes of this case. *See Saufo`i v. Am. Samoa Gov't*, 14 A.S.R.2d 51, 52-53 (Trial Div. 1990).

## I. Facts

The parties stipulate that following his conviction of assault in the third degree, Raymond was a prisoner at the CF serving a five year term of

detention as a condition of probation; that on July 1, 1995, at 3:00 a.m., Raymond attempted to commit suicide by hanging himself with electric wire; and that later the same day, at 4:47 p.m., Raymond committed suicide by hanging himself with a rope.

Other relevant facts are not seriously in dispute. Raymond began serving his five year detention period on May 22, 1995. Raymond escaped from the CF on June 24, and was returned to the CF on June 28. Raymond was then placed in a holding cell, which allowed for closer monitoring than other cells. The holding cell was visible from the CF's receiving desk 30 or less feet away. Because the floor in the holding cell was frequently wet from flushing the toilet, a cot for sleeping, rather than a mat, was brought to the cell. However, the cot frame was tied together with electric wire and fishing net rope.

At 3:00 am, on July 1, 1995, during a routine check, CF Officers Solovaa Mageo and Liaiga Seui discovered bruises on Raymond's neck. They searched Raymond's cell and discovered a piece of electric wire and a piece of glass, which they removed from the cell. They found nothing else unusual in the cell. Raymond indicated that the glass was simply a mirror. The CF officers concluded that Raymond has attempted to kill himself using the electric wire.

The watch commander that night, CF Officer Fauamoli Taufete`e Ah Mu ("Ah Mu") counseled Raymond for approximately 10 to 15 minutes. She spoke to Raymond about the marks on his neck and advised him that it was against God's will to commit suicide. She also reminded him of his family. According to Ah Mu, Raymond seemed to be "O.K." and happy after the counseling. He indicated that he was tired and wanted to sleep. Raymond was returned to the holding cell.

Part of the guard duty at the CF entails checking inmates' cells every half hour. In actuality, at the time of Raymond's suicide, cell checks occurred between every half hour and every hour due to the length of time it takes to check all the cells with a duty staff of only two to four guards. The CF officers continued to check on Raymond after returning him to the holding cell. However, this was done more often, approximately every half hour, to ensure his safety. At the end of the shift at 6:00 a.m., Ah Mu informed the incoming watch commander about Raymond's attempted suicide.

On the afternoon of the same day, July 1, Raymond refused to eat dinner at the 4:00 p.m. regular mealtime. He was last seen alive at approximately 4:25 p.m., when CF Officer Kilisitina Simanu ("Simanu") checked Raymond's cell. Simanu then found Raymond, at approximately 4:47 p.m., hung by his neck in his cell. Raymond hung himself with the rope that had been used to tie his cot together.

## II. Governmental Immunity

 Under the Government Tort Liability Act, A.S.C.A. §§ 43.1201-.1213, ASG is generally liable in the same manner and to the same extent as private individuals, but is immune from liability for "any claim based upon the exercise or performance of, or the failure to exercise or perform, a discretionary function or duty of an officer or employee." A.S.C.A. §§ 43.1203(a), (b)(2). Section 43.1203(b)(2), almost identical to its counterpart in the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a), means that ASG is immune from liability if the activity its officer or employee was performing is deemed discretionary.

This Court's interpretations have come to differing conclusions as to the proper standard for what constitutes discretionary functions. Two cases, *Savage v. Am. Samoa Gov't*, 1 A.S.R.2d 102, 105-06 (Trial Div. 1983) and *Ala v. Am. Samoa Gov't*, 2 A.S.R.3d 163, 168-69 (Trial Div. 1998), utilize the traditional distinction between activities at the "planning level" and those at the "operational level." Under this distinction, actions at the planning stage are considered discretionary and are therefore afforded immunity, while actions undertaken to carry out government programs are not afforded such protection. *See Berkowitz v. United States*, 486 U.S. 531, 546-47 (1988).

The *Savage* Court found ASG liable for general failure to provide adequate security measures when its officers and employees knew a particularly vicious stray dog was roaming in ASG's housing area. The Court found that ASG could not claim discretionary immunity for failure to act in the face of a known danger. *Savage*, 1 A.S.R.2d at 106.[1] Similarly, the *Ala* Court determined that only governmental action based on considerations of public policy are considered discretionary, and denied immunity for the failure to maintain a public restroom. *Ala*, 2 A.S.R.3d at 168-69.

The Court revisited the issue of what constitutes discretionary action in the recent case of *Gibbons v. Am. Samoa Gov't*, 3 A.S.R.3d 135 (Trial Div. 1999). *Gibbons* involved the tortious acts of an escaped CF prisoner. In analyzing whether the CF officers' actions constituted a discretionary function, the *Gibbons* Court followed the standard enunciated in *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). *Gibbons*, 3 A.S.R.3d at 139. The *Gaubert* standard is one in which "discretionary functions" were defined as acts which "involve an element of judgment or choice." *Gaubert*, 499 U.S. at 322-23. In

---

[1] The *Savage* Court also held, alternatively, that ASG was not immune from tort liability when its activity was proprietary in nature, and found that the operation of ASG's housing for its employees was such an activity. *Savage*, 1 A.S.R.2d at 107.

defining discretionary functions in this way, the *Gibbons* Court rejected the *Savage* and *Ala* approach, instead using what it deemed a more flexible standard. This approach allows more day-to-day decisions to be considered discretionary, and thus immune, because it potentially makes any decision that involves a choice or judgment to be immune.[2]

While we agree with the *Gibbons* Court that discretionary conduct should not be confined to the policy or planning level, we are reluctant to broaden immunity as wide as *Gibbons* implies may be appropriate. It is true that:

> matters involv[ing] basic issues of resource allocation and requir[ing] close judgment calls . . . are best left to those trained in the field of penal administration. Within reason, prison officials must be given appropriate leeway to run the Correctional Facility as they deem to be most effective given their available resources; in short, the court will not seize our inevitable advantage of perfect hindsight to hold such decisions unreasonable after the fact.

*Gibbons*, 3 A.S.R.3d at 140.

■ However, A.S.C.A. § 43.1203(b)(2) is not reasonably interpreted to provide immunity for every activity in which any choice is made. In determining immunity, it is necessary to look at whether ASG's officer or employee, regardless of position or rank, was allowed to make independent policy judgments, or was simply carrying out a legal duty. *Patterson v. United States*, 856 F.2d 670, 674 (4th Cir. 1988).

When prison officials become aware of a dangerous situation, the decision to act is not discretionary. Indeed, the specific actions taken in these situations involve some element of judgment. However, "[w]hatever is done or not done at any institution involves a decision by someone, but this does not mean that all acts are exempt from tortious liability as discretionary." *Cohen v. United States*, 252 F. Supp. 679, 687 (N.D. Ga. 1966) (duty of protection and safekeeping of prisoners includes ordinary care in the classification of prisoners and their custody once classified).

■ It is impossible to precisely delineate where the line should be drawn; it is enough here to say that the duty to exercise ordinary diligence to keep prisoners safe and free from harm, *Savage*, 1 A.S.R.2d at 106, prescribes a duty to act in the face of a known danger.[2] When a

---

[2] Under federal law, there is a duty requiring the "exercise of ordinary diligence to keep prisoners safe and free from harm." 18 U.S.C.A. § 4042. American Samoa has no equivalent statute, but that does not mean

prison is confronted with a suicidal inmate, there arises a non-discretionary duty to act, and ASG does not have immunity from liability for its officers' or employees' actions.

## III. Liability

In a negligent death action, the plaintiff must show a duty owed to the decedent and a breach of that duty that proximately caused the death.

### A. Duty

As discussed above with reference to immunity, ASG owes a duty to all prisoners to keep them safe and free from harm. *Am. Samoa Gov't v. Agasiva*, 6 A.S.R.2d 32, 39 (Trial Div. 1987). This Court in *Rakshan v. Tuilefano*, 118 A.S.R.2d 46, 48 (Trial Div. 1991) stated that ASG has an obligation to protect fellow inmates and members of the general public from a prisoner's harmful acts. Cases in other jurisdictions have found that the duty to use reasonable care in protecting inmates extends to protecting inmates from self-inflicted injury. *See, e.g., Scott v. Louisiana*, 618 So. 2d 1053, 1056-58 (La. App. 1993); *Falkenstein v. City of Bismark*, 268 N.W.2d 787, 791-92 (N.D. 1978); Jane M. Draper, *Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner*, 79 A.L.R.3d 1210 (1977). The duty to protect inmates includes an obligation to protect prisoners from harm they may do to themselves. ASG therefore had a duty to protect Raymond, not only from other prisoners, but also from himself.

### B. Breach

The duty to protect prisoners is not absolute, and ASG is not liable for all harm that comes to prisoners, regardless of the cause. Even with the knowledge that a prisoner may be suicidal, ASG does not have an absolute duty to prevent it from happening. ASG will only have breached its duty of care if it knew or should have known of the risk to Raymond and it failed to take reasonable measures to prevent the suicide. *Scott*, 618 So.2d at 1056.

The CF officers knew that Raymond was a risk to himself, since they knew he had attempted to commit suicide. It is not entirely clear that they understood that Raymond posed an ongoing risk after Ah Mu counseled him. However, they checked Raymond more frequently after his suicide attempt, and knowledge of this attempt was passed on to the

---

that ASG has no duty with respect to prisoners. ASG has a duty to protect prisoners against assault and injury by other prisoners, *Am. Samoa Gov't v. Agasiva*, 6 A.S.R.2d 32, 39 (Trial Div. 1987), and the federal standard is instructive in this respect.

next shift of CF officers. Regardless, prison officials should know that a prisoner, having demonstrated suicidal tendencies, might attempt suicide again.

We now turn to the question of whether the TCF guards took adequate measures to protect Raymond. The steps taken included 10 to 15 minutes of counseling from Ah Mu, an examination of Raymond's cell, an increase in the frequency of routine checks of his cell, and passing on information of his attempted suicide to the incoming staff shift. We are mindful that it easier to determine optimal responses with the benefit of hindsight, and are wary of substituting our judgment for that of the CF's personnel, who must make on-the-spot decisions about the proper course of action. Nonetheless, we find these measures to be inadequate under the circumstances.

■ The CF officers examined Raymond's cell, indicating that they knew to search for dangerous items, but they either failed to inspect the cot that was placed in the cell or did not do so thoroughly. A rope tying the bed together would not be something so hidden that it would not be discovered by inspection. In failing to adequately check the bed, they left a rope in the cell, an item similar to the wire which Raymond had just used in an attempt to kill himself.

The failure to check the cot properly is, in itself, sufficient for finding negligence. Other failures also contributed to the inadequacy of the CF officers' actions to protect Raymond. The CF officers did not obtain counseling services from a mental health professional, conduct a 24-hour suicide watch, or undertake any other substantial action to protect Raymond until his mental health could be assessed. While these oversights alone might not support a finding of negligence, they underscore the insufficiency of the actions actually taken to protect Raymond.

C. Proximate Causation

■ To be liable for negligent conduct, a party's actions must be a "substantial factor in bringing about the harm." RESTATEMENT (SECOND) OF TORTS § 431 (1977). Even when another person's actions are a cause of the harm, a party is not absolved of responsibility if that party's negligence creates the foreseeable risk of harm and is a substantial factor in causing the harm. RESTATEMENT (SECOND) OF TORTS § 442A.

In determining whether or not the actions of the CF's guards were a substantial factor in causing Raymond's death, it is not enough to determine that Raymond committed suicide. Instead, we must look at whether or not it was foreseeable that Raymond would harm himself due to the failure of the CF's officers to remove the rope from his cell.

Simply stated, if it was foreseeable that Raymond might attempt suicide again, then ASG is liable for its failure to protect him.

It is foreseeable that a prisoner who has attempted suicide would attempt to do so again. *See Guice v. Enfinger*, 389 So. 2d 270, 271 (Fla. App. 1980) (no duty to remove prisoner's belt when his suicide was not foreseeable because he had not attempted suicide in the past and had shown no suicidal tendencies). Based upon Raymond's suicide attempt during the previous night, we find that Raymond's death by suicide was foreseeable, and that the failure of the CF's officers to adequately protect him from harming himself was a proximate cause of his death.

## D. Comparative Negligence

ASG neither argued nor briefed comparative negligence as an issue, perhaps in expectation of total, undiluted victory. Plaintiffs did not raise the issue, understandably, but perhaps had a similar expectation. In any event, this is a very important issue that requires resolution in this case. Thus, we have considered whether Raymond's actions constituted negligence that would reduce the family's recovery. We find that Raymond's suicide was comparatively negligent under the circumstances, and reduce plaintiffs' recovery accordingly.

### 1. Comparative Negligence Generally

Under ASCA § 43.5101, in an action for personal injuries, or where the injuries resulted in death, "the fact that the person injured . . . may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the court in proportion to the amount of negligence attributable to the person injured . . . ." Although we no longer use the principle of contributory negligence to bar recovery to injured parties or their next of kin in this jurisdiction, it is instructive to look at that principle in determining the comparative degree of fault. Contributory negligence has been defined as:

> (a) an intentional and unreasonable exposure of himself to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know, or
> (b) conduct which . . . falls short of the standard to which the reasonable man should conform in order to protect himself from harm.

RESTATEMENT (SECOND) OF TORTS § 925. Recovery should be reduced under the rubric of comparative negligence if a party "voluntarily and intentionally subjects himself unnecessarily to an unreasonable risk or to a dangerous instrumentality or condition, the peril of which is, or should be appreciated by the person injured." 57A AM. JUR. 2D *Negligence* §

860 (1989).

## 2. Suicide as Comparative Negligence

Several courts have considered whether suicide can constitute contributory or comparative negligence, and they have come to varying results. Several cases have found that plaintiff-decedents may be comparatively negligent when they committed suicide while in custody. In *Heflin v. Stewart County*, No. 01-A-01-9504-CV-00131, slip op. at 2 (Tenn. App. Oct. 20, 1995), the court found comparative negligence in circumstances very similar to the present case. In that case, the prison knew the decedent was a flight risk, and knew he had attempted suicide once previously. *Id.* at 2. The court found the county jail liable for decedent's suicide for the failure of its jail officials to check beds often enough, and then reduced the award by fifty percent based on decedent's negligence. *Id.* at 7. Similarly, the majority in *Hickey v. Zezulka*, 487 N.W.2d 106, 123 (1992) (four judge majority on this issue, listed as concurring opinion), found that a prison guard was negligent for his failure to remove the prisoner's belt and adequately monitor him, and held that the jury should have been given a comparative negligence instruction regarding the prisoner's suicide.

Other courts have come to the contrary rule that the suicide of a person in custody cannot constitute comparative negligence. These courts reason that because the duty of care encompasses protection of another from a specific harm, the failure of the deceased to exercise reasonable care in preventing that harm cannot be the basis of a contributory negligence defense. *Sauders v. County of Steuben*, 693 N.E.2d 16, 21 (Ind. 1998); *Cowan v. Doering*, 545 A.2d 159, 162-63 (N.J. 1988); *Cole v. Multinomah County*, 592 P.2d 221, 223 (Or. App. 1979). Under this rule, the patient's capacity does not bear on the applicability of the suicidal party's negligence because "the acts which the plaintiff's mental illness allegedly caused him to commit were the very acts which defendants had a duty to prevent, and these same acts cannot, as a matter of law, constitute contributory negligence." *Cole*, 592 P.2d at 223.

Several of the courts in the cases rejecting the contributory negligence defense were concerned that allowing contributory negligence would effectively eliminate the cause of action for wrongful death in suicide cases. *See, e.g., Saunders*, 693 N.E.2d at 19. One court stated, "because it would serve to excuse defendants' own failure to exercise reasonable care, such conduct by the plaintiff could not be the basis of a contributory negligence defense." *Cowan*, 545 A.2d at 163. This concern, however, does not exist in a jurisdiction that has abolished contributory negligence in favor of comparative negligence because finding the decedent comparatively negligent will not absolve custodians of responsibility. Damages will be reduced in some circumstances, but it

will not excuse defendants' failures or bar recovery.

Some of these courts also proceeded under the view that intentional conduct cannot constitute contributory negligence. One court, for example, stated that negligence is qualitatively different from intentional conduct, rendering the two impossible to compare. *Hickey,* 487 N.W.2d at 121 (three judge concurrence on this issue). It is true that the language of "fault" and "negligence" do not fit well when discussing the decision to end one's life. However, as discussed above, intentional conduct can constitute contributory negligence when it indicates a disregard for one's own safety. Furthermore, the goal of comparative negligence is served by allowing a diminution in damages for the intentional conduct of another as well as negligent conduct. The majority in *Hickey* is in accord:

> [The goal of apportioning damages] is thwarted when a slightly negligent defendant is held liable for one hundred percent of the damages caused principally by the wrongful conduct of another. Jurors are capable of reaching a rational and sensible balance between the decedent's fault and the negligent jailer's fault. Comparison of "qualitatively different" conduct, which the signers of the lead opinion find to be "not capable of comparison," is not only possible, but is required by this Court's adoption of "pure" comparative fault.

*Hickey,* 487 N.W.2d at 124 (four judge majority on this issue).

*3. Standard of Care*

A capacity-based standard has now become generally accepted in analyzing the comparative negligence of a mentally disturbed person. *See, e.g., Cowan,* 545 A.2d at 163; *Warner v. Kiowa County Hospital Authority,* 551 P.2d 1179, 1187-88 (Okla. App. 1976); *Feldman v. Howard,* 214 N.E.2d 235, 237 (Ohio 1966); *Noel v. NcCaig,* 258 P.2d 234, 241 (Kan. 1953). While a person lacking mental capacity to maintain responsibility cannot be comparatively negligent, a person having only diminished capacity may well be capable of negligent conduct. *See, e.g., Heflin,* No. 01-A-01-9504-CV-00131 at 18; *Hickey,* 487 N.W.2d at 123 (four judge majority on this issue).

Unlike most of the cases that have dealt with this issue, this is not a situation in which Raymond had been found to have a mental illness. In fact, we have little information on Raymond's mental state that would aid us in determining his capacity. We simply know that he was a prisoner at the CF, he had recently escaped from there and had been returned, and he had attempted suicide earlier the same day that he killed himself. However, there is no indication that he was insane or that he

51

had been suicidal for a substantial period. At the same time, one of the CF officers' shortcomings in this situation was their failure to seek mental health evaluation and treatment for Raymond.

■ We have sympathy for any person pained and desperate enough to kill oneself. Nonetheless, in finding comparative negligence, we are acknowledging that Raymond disregarded his own safety and was a significant causal factor in his own death. We find that plaintiffs' recovery should be reduced by 50%.

## IV. Damages

### A. Damages Requested

Plaintiffs request $336,000, the money they state Raymond would have made had he been released as expected and had he lived until age 67. Raymond would have been released from CF at age 27, and plaintiffs assume he would have lived until age 67. They state that Raymond made $700.00 per month before he was incarcerated, $300.00 from selling food from the family plantation and $400.00 from selling fish that he caught. To reach the $336,000 figure, plaintiffs multiplied $700.00 by 12 months per year by 40 years.

When Raymond worked at a wage-earning job, he gave the family $200.00 every two weeks. However, before he was incarcerated, he stopped working the job and began working on the family's plantation. Pisa, who is Raymond's father and the estate representative, testified that Raymond gave all $300.00 of his farming revenue each month to his parents.

Plaintiffs also note that they may receive compensation under A.S.C.A. § 43.5001(c) for loss of love and affection, but do not request a specific amount.

### B. Damage to Plaintiffs

■ Under A.S.C.A. § 43.5001(c), the claimants in a wrongful death action may receive compensation for both "pecuniary injury and loss of love and affection, including: . . . loss of society, companionship, comfort, consortium, or protection; . . . [and] loss of filial care or attention ."

*1. Pecuniary Injury*

■ The claimants' pecuniary loss is the value of the decedent's estimated annual financial benefit to the claimants for as long as such benefit could have been expected to continue. *Fa`avae v. Am. Samoa*

52

*Power Auth.*, 5 A.S.R.2d 53, 56 (Trial Div. 1987). The *Fa`avae* Court allowed for $1,000 per year, and determined the duration of the payments based on the estimated life span of the parents, not the decedent, because the decedent would have only paid money to the parents for the length of the parents' lives. *Id.*

a. PARENTS

Since Raymond provided $200.00 each month to his parents while earning wages and $300.00 when working on the farm, $250.00 per month is a reasonable estimate of the average amount Raymond would have given them, or $3,000 per year. While it is never comfortable to estimate how long someone will live, we may only provide damages for pecuniary loss during the lives of the parents. Pisa is 63 years old, and it is reasonable to estimate that the parents will live another 20 years. DEPT. OF COMMERCE, RESEARCH AND STATISTICS DIV., AM. SAMOA STATISTICAL DIGEST, tbl. 2.18 (1997) (life expectancy for a male, ages 60-64, is 17 years and life expectancy for a female, ages 60-64, is 21 years). Raymond would have been released in approximately five years, leaving 15 years to help support his parents. The Court therefore will allow for 15 years' support at $3,000 per year, making $45,000 total.

Money recovered now is worth more than if the decedent had provided it years in the future. It is therefore proper to discount recovery to the money's present value. For example, the *Fa`avae* Court discounted the value of recovery as follows: the Court estimated 25 years of $1,000 payments, making recovery $25,000, but reduced the amount to $16,000 by discounting the present value, using an interest rate of 6% and assuming an unchanged inflation rate. *Fa`avae*, 5 A.S.R.2d at 57.

Once the appropriate discount percentage is assessed, the present value of periodic payments for a specified future period can be determined mathematically. Selection of the appropriate discount percentage is anything but an exact process. However, we believe that since *Fava've* was decided, economic conditions in the Territory, in terms of interest and inflation rates, have not dramatically changed and will not do so in the foreseeable future. We are also cognizant of some inherent doubt or risk that, given his history as a wage earner and farmer, Raymond would actually have been able to support his parents continuously as much as the amount specified by the Court for 15 years. Considering these factors, we find that a 5% discount rate is appropriate. Using that rate, and applying an applicable mathematical table, we have determined that the present value of the $45,000 that would have been paid over 15 years is $25,000.00.[3]

_____

[3] For this purpose, we used a computerized net present value (NPV) function to calculate the present value from the interest rate and

### b. SIBLINGS

 Parents should generally receive a larger share than siblings based on pecuniary injury because decedents are more likely to support parents than siblings. *See Saufo 'i v. Am. Samoa Gov't*, 14 A.S.R.2d 51, 53 (Trial Div. 1990). With the exception of Siulagi, his 16 year old sister, the siblings are all older than Raymond, who was 22 at the time of his death.

All of Raymond's siblings are or will be adults by the time Raymond would have been released from his CF detention period. As there is no evidence that Raymond supported them financially prior to his incarceration, we find that they are unlikely to have received financial support from him after his release. The siblings therefore will not be awarded any damages for pecuniary losses.

### 2. Loss of Love and Affection

 It is nearly impossible to provide standards for determining amounts for non-pecuniary losses, and placing a value on the loss of a loved one is speculative, at best. Siblings are ordinarily entitled to recover for wrongful death even though a parent may be living, provided that they can show the requisite injury. *Saufo 'i*, 14 A.S.R.2d at 53. As with pecuniary injury, this Court has tended to award more to parents than siblings. *Id.* ($18,037.50 total to the parents and $3,000 each to four siblings); *Galo v. Am. Samoa Gov't*, 10 A.S.R.2d 94, 98 (Trial Div. 1989) ($18,000 total to the parents, $3,000 to one sibling, and $2,000 to another sibling).

We find that Raymond's parents are together entitled to $10,000, Siulagi, the 16 year old sister, is entitled to $2,500, and the other siblings are entitled to $1,000 each, making $6,000 total for these six siblings. One sister, Joanna, is now deceased, so her share shall be distributed to her estate.

### 3. Pain and Suffering

The estate is also named as a party, and may recover as the successor in

---

payments. More specifically, we calculated the net present value of $250.00 per month for 15 years at 5% annual interest (.4167% monthly interest, calculated by dividing 5% by 12 months), beginning in five years. The payments and interest rate were set to zero for the first five years (60 months), the years Raymond would have been incarcerated. For tile following 15 years (180 months), we used the .4167% monthly interest rate and $250.00 monthly payment. The total present value came to $24,633.65, and this figure is properly rounded off for simplicity to $25,000.

interest to a claim Raymond would have had for his pain and suffering. ASCA § 43.5002; *Galo*, 10 A.S.R.2d at 97-98 ($4,000 for both pain and suffering and funeral expenses in an infant's death). Raymond would have had a claim for his pain and suffering. It is impossible to determine how long Raymond suffered before his death. We assume his death came quickly, however, and award $3,000 to Raymond's estate for his pain and suffering.

C. Summary of Damages

We summarize our damage calculations as follows:

```
Pecuniary Loss:
Parents (present value of $45,000). . . . . . . . . . . . $25,000
Siblings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

Loss of Love and Affection:
Parents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,000
Sister Siulagi. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,500
Other siblings (at $1,000 each). . . . . . . . . . . . . . 6,000

Pain and Suffering:
Estate of Raymond Schwenke . . . . . . . . . . . . . . . 3,000

Total before comparative negligence adjustment: $46,500

Total after comparative negligence adjustment: $23,250
```

## Order

Plaintiffs shall recover from ASG damages in the total amount of $26,500 for the wrongful death of Raymond. This amount shall be apportioned among and paid to the plaintiffs, as follows:

```
Parents Pisa and Sina . . . . . . . . . . . . . . . . . . . . . .$17,500
Sister Siulagi. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,250
Brother Pisa, Jr.. . . . . . . . . . . . . . . . . . . . . . . . . . . 500
Sister Joanna's estate . . . . . . . . . . . . . . . . . . . . . . 500
Brother Henry. . . . . . . . . . . . . . . . . . . . . . . . . . . . 500
Brother Jerry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500
Brother Sulusi. . . . . . . . . . . . . . . . . . . . . . . . . . . . 500
Brother Afele. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500
Raymond's estate. . . . . . . . . . . . . . . . . . . . . . . . . 1,500
Total $23,250
```

ASG shall pay the total judgment amount into the Court's registry. The Clerk of the Court shall then distribute the funds to plaintiffs, according

to 'their respective entitlements. Until she reaches majority or is otherwise emancipated, however, the Clerk of the Court shall retain Siulagi's share of the funds in the Court registry. A guardianship of Siulagi's estate is created, with Pisa and Sina as the guardians, and the Clerk of the Court shall establish a separate probate file for this purpose. Prior to her majority or emancipation, funds in the guardianship estate shall not be released except upon the application of at least one of the guardians and the prior approval of a justice of this Court.

Judgment shall enter accordingly.

It is so ordered.