# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 10, 2023

Lyle W. Cayce
Clerk

No. 22-30248

BRITTANY GUILLOT, *on behalf of her minor child* T.A.G.,

*Plaintiff—Appellant*,

*versus*

JAY RUSSELL, *in his official capacity as Ouachita Parish Sheriff*;
PAT JOHNSON, *Warden Ouachita Correctional Center*;
JOHN DOE, *Ouachita Parish Sheriff's Deputy*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:20-CV-1537

Before JONES, SMITH, and GRAVES, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Blake Powell committed suicide in his cell. On behalf of her minor child, Brittany Guillot sued Pat Johnson, the then-warden at Ouachita Correctional Center ("OCC"), and Jay Russell, the sheriff of Ouachita Parish, in their official capacities; she also purports to have sued them in their individual capacities. All federal claims are brought under 42 U.S.C. § 1983 for violations of Powell's Eighth Amendment rights. Guillot additionally sued under related state laws for negligence and vicarious liability. The district

No. 22-30248

court granted summary judgment, and we affirm.

## I.
## A.

On March 13, 2020, Powell committed suicide in his cell at OCC, where he had been incarcerated for four months after his arrest for the unauthorized entry of an inhabited dwelling and possession of a controlled dangerous substance.[1]  Powell is allegedly the father of minor T.A.G., on whose behalf Guillot sued.  Guillot contends that defendants are legally responsible for Powell's suicide because, as an inmate, Powell was under OCC's care and supervision.

At his booking on November 9, 2019, Powell stated that he asked the victim of his burglaries to "kill him" and was subsequently placed on suicide watch, from which Dr. David Boyle, the OCC mental health professional, released him on November 13.  On January 23, 2020, Powell spoke to OCC personnel, through the speaker box in his cell, stating that he was suicidal. He was placed on a second suicide watch with an associated suicide log.  Boyle released Powell from suicide watch on January 27 and recommended that he return the next week for a follow-up visit, which never occurred.  At the January 27 visit, Boyle stated that Powell had no signs of suicidal inclinations and seemed well.

On February 17, Powell was involved in a fight with another inmate and told a deputy that he would keep fighting anyone placed in a cell with him.  The next day, OCC personnel noticed that Powell was "acting distant" with a "blank stare" and had abrasions on his wrist.  There is no record evidence discussing how severe the abrasions were.  An OCC personnel member

---

[1] Powell pleaded guilty in February 2020 and received a two-year sentence.

No. 22-30248

noticed that Powell was unkempt, was not eating, had lost weight, was sleeping poorly, was not communicative, and was depressed. Powell told staff that he "need[ed] help" and was then placed in a cell for observation, but not on suicide watch, nor was he scheduled to meet with a mental health professional. He was instead placed on "heightened observation." There is no definition or official procedure provided by OCC for what heightened observation is.

On March 3, Powell told OCC personnel that he believed he had been raped in his cell and asked to be placed in a cell alone. Although the rape allegation turned out to be false, OCC's nurse recommended that Powell visit Boyle. But Powell did not see Boyle, who testified that given the following behaviors, he would have wanted to see Powell.

On March 13, Powell expressed frustration with his cellmate and asked for the cellmate to be removed. A prison employee did so. Powell was found on the morning of March 14. He had hanged himself with a towel tied to his shower rod.

The employees assigned to Powell's dorm signed affidavits stating that they did not see any risk of suicide from Powell on March 13–14 and did not see any distress from Powell that night, nor any indication that he was a danger to himself.[2] Named defendants Johnson and Russell had no interaction with Powell on March 13.

## B.

OCC's Policy and Procedure Manual includes a Suicide Prevention Policy. All staff responsible for offender supervision are ostensibly trained in

---

[2] The Deputies assigned to Powell's dorm that night were Deputy Webb Crecink, Lieutenant Richie Varino, Corporal Daryl Wells, Deputy Roy McLendon, Deputy Brian Milstead, Corporal Vance Whitton, and Deputy Ethan Bonner.

No. 22-30248

the policy.  The policy starts at intake, where deputies are required to look for signs of suicidal inclinations.  The policy requires staff to report, to their supervisor, any inmate with the following signs:

1.  Keeps to himself and speaks very little to others.
2.  When he does speak, he says little and usually says it slowly.
3.  Extremely restless, pacing up and down, and wrings hands.
4.  May cry and be unable to sleep.
5.  Quiet and subdued.
6.  Threatens suicide.
7.  Begins to give away personal items.

If any of these conditions is observed, the supervisor must place the inmate on suicide watch, which comes with the following instructions and restrictions:

1.  Contact the medical staff.
2.  The offender is to be dressed in quilted smock.
3.  The offender is to be placed into a holding cell.
4.  The offender placed on suicide watch will be observed and logged at least every fifteen (15) minutes.
5.  Meals served to offenders on suicide watch will be served on disposable plates and utensils.
6.  Only the medical [doctor] will be able to remove an offender from suicide watch.
7.  If an offender is placed on suicide watch, his personal property should be removed from the dorm and stored.
8.  An offender on suicide watch will not be allowed to have any property in the cell.

Deputies are provided annual training in these suicide-prevention policies.  On the night of Powell's suicide, seven of the eight deputies on duty had undergone the training.  The one deputy who had not done the training was shadowing a deputy who had.  Paul Campbell, the current warden of OCC, initially stated at his deposition that there had been several suicides at

OCC in the past five years, before amending his testimony in an affidavit to state the last suicide before Powell had been in 2011.

## C.

As stated, Guillot sued Johnson and Russell in their official capacities. She also purports to have sued both of them in their individual capacities. All federal claims are brought per § 1983 for alleged violations of Powell's Eighth Amendment rights. Guillot also sued under related state law laws for negligence and vicarious liability per La. Civ. Code arts. 2315 (liability for acts causing damages), 2315.1 (survival action), 2315.2 (wrongful death action), 2316 (negligence, imprudence, or want of skill), 2317 (acts of others and of things in custody), 2320 (acts of servants, students, or apprentices), and 2324 (liability as solidary or joint and divisible obligation).

## II.

This court reviews a summary judgment *de novo* and "appl[ies] the same criteria used by the district court in the first instance." *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). "As is appropriate at the summary-judgment stage, facts that are subject to genuine dispute are viewed in the light most favorable to [the non-moving party]." *Taylor v. Riojas*, 141 S. Ct. 52, 53 n.1 (2020) (per curiam).

Summary judgment can be granted only where, with the evidence before the court, the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when its resolution might affect the case's outcome under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Southern Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337, 343 (5th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).

No. 22-30248

Although courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting from the opinion of the district court, which the Fifth Circuit adopted in full). " 'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

There can be no genuine dispute as to a material fact where a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Speculative theories cannot defeat a motion for summary judgment. *See Little*, 37 F.3d at 1077. "[W]e may affirm a summary judgment on any ground supported by the record and advanced below, regardless of whether the district court relied upon it." *Dillard v. City of Austin*, 837 F.3d 557, 562 n.2 (5th Cir. 2016).

## III.

Guillot brings official-capacity claims against Johnson, the warden, and Russell, the sheriff, claiming the policies and procedures at OCC violated Powell's Eighth Amendment rights. Namely, Guillot alleges that defendants were aware of Powell's suicidal tendencies yet ignored their procedures and, instead, followed a "heightened-observation" policy that was so deficient it amounted to deliberate indifference to Powell's medical needs. As noted, Guillot also purportedly brings claims against both defendants in their indi-

6

vidual capacities.  Finally, Guillot brings state-level claims for negligence against both defendants.  All of these claims fail.

## A.

### 1.

As a threshold matter, Johnson cannot be sued in his official capacity. Official-capacity suits may be brought only against an official acting as a policymaker, such that his decisions represent the official policy of the local government unit. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  We look to state law when making that determination.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (plurality opinion).  In Louisiana, the sheriff is the final policymaker.[3]  The district court judged so accordingly.

Guillot does not attempt to rebut that judgment.  Parties forfeit contentions by inadequately briefing them on appeal. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 n.1 (5th Cir. 2021); *see also* FED. R. APP. P. 28(a)(8)(A). Adequate briefing requires a party to raise an issue in its opening brief. *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016).  "To be adequate, a brief must address the district court's analysis and explain how it erred." *SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) (quotation omitted).

In her reply brief, Guillot attempts to address the judgment.  Though the issue is forfeited regardless, her arguments are meritless.  First, she cites *Walker v. Upshaw*, 515 F. App'x 334 (5th Cir. 2013) (per curiam), which is inapposite in that it analyzes whether a warden sued in his *individual capacity* was entitled to qualified immunity.[4]  Second, Guillot posits that Johnson is

---

[3] *See* LA. CONST. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."); LA. STAT. § 5539 ("Each sheriff . . . shall preserve the peace and apprehend public offenders."); *see also Craig v. St. Martin Parish Sheriff*, 861 F. Supp. 1290, 1300 (W.D. La. 1994).

[4] *See Walker v. Inst. Div. of Tex. Dep't of Crim. Just.*, No. H-08-530, 2011 WL

No. 22-30248

listed on the front cover of OCC's official policies and procedures handbook, making him a policymaker. That conclusory contention still does not make Johnson a final policymaker under state law.[5]

### 2.

Although Russell can be sued in his official capacity, those claims also fail. The elements under § 1983 are that the conduct (1) deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) was committed by a person acting under color of state law. 42 U.S.C. § 1983; *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Russell, as the final policymaker in the Parish, does satisfy the second requirement and can be sued in his official capacity, assuming Guillot provides evidence that the conduct prong is met.

A claim against government officials in their official capacity is a *de facto* suit against the local government entity of which the officials act as agents. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999); *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Section 1983 does not allow recovery under a theory of *respondeat superior*; a plaintiff must show that the local government's policy or custom violated the plaintiff's constitutional rights. *Hafer,* 502 U.S. at 25; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.

---

3924981, at *3 (S.D. Tex. Sept. 7, 2011), *rev'd by Walker*, 515 F. App'x at 341. *Walker* also looked to Texas, not Louisiana, law.

[5] Moreover, any suit against Johnson in his official capacity would be a suit against OCC directly, which is not a legal entity capable of being sued. *See, e.g.*, *Harris v. Brown*, No. 3:21-cv-01332, 2021 WL 5822100, at *11 (W.D. La. Nov. 22, 2021) ("Harris sued Weatherly in his official capacity as warden of the [Richland Parish Detention Center] . . . However, this court consistently has held that the RPDC is not a juridical person capable of being sued.").

1994).

"[T]he custom or policy [must] serve[] as the moving force behind the [constitutional] violation" at issue. *Meadowbriar Home For Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996). Alternatively, the plaintiff must demonstrate that his injuries result from the policy's execution. *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire*, 957 F.2d at 1278).

In jail suicide cases, federal law requires officers to "ha[ve] gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).[6] To avoid liability, "[p]rison officials charged with deliberate indifference might show . . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844.

Mere evidence that the official was "aware of a substantial risk to inmate safety does not alone establish deliberate indifference." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately

---

[6] *See also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that to be deliberately indifferent to an inmate's needs in violation of the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

No. 22-30248

was not averted." *Farmer*, 511 U.S. at 844.

Defendants aver, and the district court found, that Guillot did not adequately demonstrate the existence of an unconstitutional policy at OCC or provide proof of a *de facto* policy. Generally, Guillot does not challenge whether the OCC Suicide Prevention Policy is constitutional. Instead, she states that the Policy "seeks to avoid violations of constitutional rights, including protecting inmates from self-harm." Although this policy may be constitutional, Guillot posits that OCC had an unconstitutional *de facto* policy of placing suicidal inmates on 'heightened observation' instead of suicide watch. Still, she does not allege sufficient facts to allow a reasonable factfinder to hold that this was a *de facto* policy at OCC. And even if it was, the *de facto* policy does not have a causal link to Powell's suicide.

Similar to custom, a *de facto* policy is defined as a persistent widespread practice that, although not authorized by an officially adopted policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy. *See Webster v. City of Houston*, 735 F. 2d 838, 842 (5th Cir. 1984). "[I]solated acts" cannot establish the existence of a custom or practice. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003). Instead, prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectional conduct is the expected, accepted practice." *Webster*, 735 F.2d at 842.

According to Guillot, the custom at OCC was to apply heightened observation, which has no written definition, to inmates exhibiting suicidal tendencies. She alleges that on February 18 and March 3, 2020, Powell exhibited such tendencies. Most concerningly, on February 18, he had asked for help, was withdrawn, had a blank stare, and had wrist abrasions, yet he was not sent to suicide watch and instead was placed under heightened obser-

No. 22-30248

vation. Guillot maintains that it is a custom that allows deputies to shirk their responsibility to observe the inmates and meticulously log their observations. Under this deficient *de facto* policy, she claims Powell was denied his Eighth Amendment rights.

Nevertheless, even taking all of Guillot's factual assertions as accurate, she has not stated sufficient facts that indicate the alleged policy was a *de facto* policy. Moreover, she does not demonstrate that even if it was a *de facto* policy, that policy was the moving force behind the purported constitutional violation present here.

This circuit has consistently rejected the notion that one-off actions constitute a policy.[7] Guillot has alleged only two violations, namely, the inaction by guards after Powell's concerning acts on February 18 and March 3. Even taking at face value that Powell should have been moved to suicide watch both times, this does not prove a widespread custom of violating constitutional rights. These are one-off actions, and Guillot has not shown any other valid examples of persistent violations.

Instead, she relies on an admission by the new warden of OCC, Paul Campbell, that there were multiple suicides in the facility over the past five years. Still, that is insufficient evidence to support her argument.

First, Campbell corrected his statement, swore in an affidavit that it was a misstatement, and provided evidence that the last suicide at OCC was over a decade ago. Guillot has not rebutted the affidavit nor provided any legal argument indicating that we should reject the warden's affidavit. Instead, she argues that it is implausible that the warden made a mistake in

---

[7] *See, e.g.*, *Piotrowski v City of Hous.*, 237 F.3d 567, 581 (5th Cir. 2001); *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy.").

his original deposition.

Guillot's position is not convincing. And even assuming that Campbell's original statement was true, there is no proof connecting the other unknown suicides to the alleged policy of applying heightened observation to suicidal inmates. So Guillot cannot prevail.

After all, Powell had previously been moved to suicide watch twice before: Per their official procedures, OCC personnel had followed their constitutionally appropriate policies where an inmate presented signs of suicide. Generally speaking, a failure to follow prison policies, procedures, or regulations—without more—does not give rise to a constitutional violation. *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986).

Moreover, Guillot has not alleged a plausible causal link between the alleged "policy" and Powell's suicide. On March 13, there was no evidence that Powell exhibited suicidal tendencies that should have had deputies move him to suicide watch. On the contrary, defendants have averred that multiple deputies saw Powell that night and did not observe any of the suicidal tendencies listed in the official policy, nor any of the concerning behaviors presented on February 18 or March 3. Defendants have sworn that Powell did not appear to be in distress and did nothing to indicate that he would harm himself. One deputy spoke with Powell that night and complied with Powell's requests. Guillot has not challenged any of these facts.

Guillot also alleges that OCC failed to train its officers in implementing its suicide prevention and heightened observation policies. A municipality's failure to train officers in appropriate procedures supports § 1983 liability "only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). A city can be held liable in a failure-to-train suit only if there are "manifest signs" of suicidal tendencies.

No. 22-30248

*Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (quoting *Evans v. City of Marlin*, 986 F.2d 104, 108 (5th Cir. 1993)). A "failure to train custodial officials in screening procedures to detect *latent* suicidal tendencies does not rise to the level of a constitutional violation." *Id.* (quoting *Evans*, 986 F.2d at 107–08).

Guillot has not presented proof that Powell exhibited manifest signs of suicidal tendencies when he committed suicide. Additionally, as demonstrated in the record, all the deputies on duty in Powell's cell block were trained in suicide prevention strategies, save one shadowing another deputy. Therefore, there is no cognizable claim here.

### B.

There is no genuine dispute of material fact to hold defendants Russell and Johnson legally responsible in their individual capacities under § 1983. It is improbable that Guillot sued the defendants in their individual capacities, and those claims should fail for procedural deficiencies. Assuming that she did so, she still cannot allege a genuine dispute as to any material fact to show that defendants acted with deliberate indifference.

### 1.

In Guillot's complaint and amended complaint, it is unclear whether she intended to sue defendants in their individual capacity. Accordingly, in granting summary judgment, the court expressly stated that "[b]oth Russell and Johnson have been sued only in their official capacities."[8]

Yet on appeal in her opening brief, Guillot did not even attempt to explain whether she had adequately pleaded individual-capacity claims. As

---

[8] The court did analyze Guillot's claims in the alternative, assuming that she adequately pleaded her individual capacity claims.

13

discussed above, parties forfeit contentions by inadequately briefing them on appeal. *Rollins*, 8 F.4th at 397 n.1; *see also* FED. R. APP. P. 28(a)(8)(A). Although Guillot attempts to respond to the district court in her reply brief, arguments raised for the first time in reply are generally forfeited. *See Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 528 n.5 (5th Cir. 2020).

Even if the argument is not forfeited, Guillot did not adequately plead claims against the defendants in their individual capacities. She posits that the complaint and surrounding pleadings plainly indicate that claims were brought against the defendants in their individual capacities. That contention is not accurate.

Concerning Russell, Guillot initially alleges claims against "Jay Russell, in his official capacity as the elected Sheriff of Ouachita Parish." Only later in the complaint does Guillot appears to plead individual-capacity claims against Russell, in one paragraph, by stating, "The Ouachita Correctional center was operated and supervised by Jay Russell at all relevant times. He is sued in his individual and in his official capacity for those acts and omissions, which occurred while he was Sheriff."

Then in the amended complaint, Guillot alleged claims against "Jay Russell, in his official capacity as Ouachita Parish Sheriff, Pat Johnson, Warden Ouachita Correctional Center, and John Doe, Ouachita Parish Sheriff's Deputy." Still, in the complaint regarding fictional defendant John Doe, Guillot pleaded claims against "John Doe, in his official capacity as a[n] Ouachita Parish Sheriff's Deputy and in his personal capacity." This would indicate she was aware of the proper method of pleading individual-capacity theories.

The claims against defendant Johnson are no more clear. Guillot first merely states,

Pat Johnson, Warden of Ouachita Correctional Center, a per-

No. 22-30248

son of the full age of majority holding the office of Warden of the Ouachita Correctional Center, domiciled and residing in the Parish of Ouachita, State of Louisiana. Pat Johnson is the responsible party for day to day operations of the Ouachita Correctional Center.

Additionally, in Guillot's Memorandum in Opposition to defendants' Motion for Partial Judgment on the Pleadings, she plainly stated, "Plaintiff does not seek to bring any individual capacity claims against either Sheriff Jay Russell or Warden Pat Johnson."[9]

None of the above satisfies Federal Rule of Civil Procedure 8(a)(2), requiring that a plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Although pleadings are to be construed to do justice, per Rule 8(e), Guillot has had numerous opportunities to amend her complaint and clarify in what capacity she is attempting to sue these defendants. Unfortunately, she has not taken any of those opportunities.

2.

Even if Guillot adequately pleaded her individual-capacity claims, she has not alleged a genuine dispute as to any material fact to hold defendants responsible under a supervisory-liability theory.[10] In the posture presented here, Guillot must establish that the defendants acted with deliberate indifference. *See Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738–39 (5th Cir. 1997).

---

[9] Later, after realizing that disclaimer would foreclose a significant number of her arguments, Guillot averred that she "hereby withdraws any previous representation made in briefing that [she] has not brought individual capacity claims, which was oversight on [her] part. [Her] Complaint very clearly asserts individual capacity claims and [she] maintains these claims against both Sheriff Russell and Warden Johnson."

[10] Plaintiff has not alleged that either Russell or Johnson participated in or actively caused Powell's death. Therefore, they can be liable only in their capacities as supervisors.

A prison official acts with deliberate indifference only if "he knows that inmates face a substantial risk of serious bodily harm . . . [and] disregards that risk by failing to take reasonable measures to abate it." *Hyatt*, 843 F.3d at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (omission in original)).[11] An inmate must show that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "[N]egligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999) (quoting *Hare*, 74 F.3d at 645).[12] This court has almost uniformly found deliberate indifference to be a "high standard." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

Guillot has not stated sufficient facts to allow a trier of fact reasonably to find for her under the deliberate-indifference standard. Analyzing the facts in the best possible light for the plaintiff, Guillot can show that the defendants knew Powell had been suicidal in the past and should have been moved to suicide watch after the incidents on February 17 and March 3. But Guillot has shown no facts indicating that Powell exhibited signs of suicidal behavior on March 13. The most she can show is negligent inaction, not deliberate indifference, on the part of prison officials on and around February 17 and March 3. The officials would not have known that Powell was a substantial risk to himself on March 13 based on the facts presented about his behavior

---

[11] *See also Rhyne v. Henderson Cnty.*, 973 F.2d 386, 391 (5th Cir. 1992) ("The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights.").

[12] "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Frazier v. Keith*, 707 F. App'x 823, 824 (5th Cir. 2018) (per curiam).

on that date.

*Hyatt* is instructive on the deliberate indifference standard as applied to suicidal inmates.  Police were called to do a welfare check on Jason Hyatt, whose wife told police he was suicidal.  Hyatt was arrested under suspicion of driving while intoxicated.  *Hyatt*, 843 F.3d at 175.  During booking, Hyatt informed officers he was feeling "very depressed," had been prescribed antidepressants, and had attempted suicide two months earlier, but answered that he was not "thinking about killing [himself] today" on the mental health form.  *Id.* (alteration in original).  The officer noted that Hyatt "came across as very happy and generally in a good mood," and "[a]t no time did [she] consider him to be a suicide risk."  *Id.* at 175–76 (alteration in original).  Hyatt was issued a regular jail uniform, but not a regulation sheet, and was put into a cell under video surveillance, only with a blind spot next to the toilet.  *Id.* at 176.  Previously, two inmates at that jail had used sheets to hang themselves in their cells.  *Id.*  The following day, Hyatt hanged himself using a plastic garbage bag that had negligently been left in his cell.  *Id.*

We affirmed the summary judgment, noting that the officer's "failure to inspect Hyatt's cell and retrieve the plastic bag, and any other potential ligatures, was perhaps negligent."  *Id.* at 179 (citing *Est. of Pollard v. Hood Cnty., Tex.*, 579 F. App'x 260, 266 (5th Cir. 2014) (per curiam)).  Nevertheless, "negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State."  *Id.* at 179–80 (quoting *Hare*, 74 F.3d at 645).

Deliberate indifference requires more than a "mere oversight," more than a mere mistake.  *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000) (quotation omitted).  Guillot, in fact, cites *Jacobs* as the best support for her deliberate-indifference theory.  Her use of the case is not apt.

In *Jacobs*, we examined whether summary judgment was proper where

the sheriff was aware of a substantial risk of suicide and placed a pretrial detainee in an inadequately protective environment. 228 F.3d at 390. The court concluded that with those particular facts, the trier of fact could find that the sheriff acted with deliberate indifference. *Id.* at 395–96.

There are some similarities with *Jacobs* present here. For example, the court found that the detainee had not given "indications that she was planning to attempt suicide or to harm herself" right before her suicide. *Id.* at 391. Nevertheless, the "record reveal[ed] that the defendants still regarded Jacobs as a suicide risk during that time. Indeed, [the sheriff] testified that Jacobs was on a 'precautionary,' though not a 'straight' suicide watch." *Id.*

Still, there are significant differences that make Guillot's claims noncomparable. First, less than four days had passed since obviously suicidal inclinations were expressed in *Jacobs*. *Id.* Looking at the evidence in the best light for the plaintiff, there was a minimum of ten days between suicidal expressions in the present case. Moreover, it is much more likely here that the last suicidal expression was several weeks before, in January.

In *Jacobs*, the sheriff, despite having strong reason to believe that the detainee was presently suicidal, took patently unreasonable measures. For example, the sheriff placed the detainee in a cell where another inmate had committed suicide. The sheriff knew that the cell had tie-off points for sheets and makeshift ropes, which were strictly forbidden in a suicide-watch cell. *Id.* at 395–96. Moreover, while the detainee was on a "precautionary" suicide watch, as distinguished from a "strict" suicide watch, the sheriff also allowed the detainee to have a towel. *Id.* at 391. Those facts differentiate the case. Here a significantly longer time gap exists, OCC officials did not regard Powell as a suicide risk at the time he committed suicide, and, twice before, OCC moved Powell to an appropriate suicide cell when he presented suicidal tendencies.

No. 22-30248

Numerous other cases undercut the notion of deliberate indifference here. For example, in *Flores*, a sheriff put an inmate "not acting like himself" under heightened observation for 12 hours. *Flores*, 124 F.3d at 737. At no time did the inmate express any "overt signs that he intended to commit suicide," so staff gave him back his blanket. *Id.* He later hanged himself with the blanket. *Id.* Although the sheriff's actions may have been "ill advised," the inmate's failure to indicate overt suicidality relieved the sheriff of any liability. *Id.* at 739. Indeed, in *Jacobs*, we summarized our holding in *Flores* as follows: "We found that the sheriff had not acted with subjective deliberate indifference because Flores did not give any indication of suicidal tendencies at the time he killed himself." *Jacobs*, 228 F.3d at 396 (citing *Flores*, 124 F.3d at 738–39).

Contemporaneity matters.[13] For example, in *DeLoach v. Bryan*, 144 F. App'x 377, 378 (5th Cir. 2005) (per curiam), we found that prior mental health treatment and a previously written "suicide note" were too separated in time from the suicide. The more recent history of the inmate's behavior, as related by the jail staff, was a better indication of his mental health at the time of his death. *Id.* at 378–79. Although failure properly to follow a suicide-prevention policy may amount to deliberate indifference, *see Pollard*, 579 F. App'x at 266, considering the facts, any noncompliance here

---

[13] It is important to note that suicide watch imposes tremendous restraints on a prisoner's activity, significantly changes the conditions of his confinement, and imposes a great amount of strain on a prison's resources. Here, prisoners in suicide-watch cells have little interaction with others, have no personal possessions, are not permitted a blanket, and are under constant observation. As a result, placing an inmate under suicide watch is a decision not taken lightly, as officials must balance the danger the inmate poses to himself and others, the restraints on his activities, and the cost to the mental health resources of the prison. Ideally, inmates are not held under suicide watch indefinitely. The previous two times Powell was placed under suicide watch, he was released within a few days.

would be at most negligent.[14]

## C.

Guillot brings state law claims for negligence and vicarious liability.[15] Under Louisiana law, a plaintiff must prove the following in order to be successful in a negligence claim: "(1) [T]he defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1991). In short form, Louisiana law prescribes a typical duty/risk analysis. *See Mart v. Hill*, 505 So. 2d 1120, 1122 (La. 1987).

Prison officials must use reasonable care to protect inmates from harm, and this duty extends to self-inflicted injury. *See Scott v. State*, 618 So. 2d 1053, 1059 (La. App. 1st Cir. 1993). No party disputes that this duty exists. In examining the duty/risk in a particular case, state law requires an "ease of association" between the injury/risk and the legal duty/rule of conduct. *Todd v. State*, 96-3090, p. 7 (La. 9/9/97), 699 So. 2d 35, 39. In prison suicide cases, this is a case-specific inquiry, *see Scott*, 618 So. 2d at 1059; *Nagle v. Gusman*,

---

[14] Additionally, even if defendants can be sued in their individual capacities, qualified immunity would likely bar suit. Because Guillot failed sufficiently to plead deliberate indifference, though, we see no need to continue the analysis.

[15] LA. CIV. CODE arts. 2315 (liability for acts causing damages), 2315.1 (survival action), 2315.2 (wrongful death action), 2316 (negligence, imprudence, or want of skill), 2317 (acts of others and of things in custody), 2320 (acts of servants, students, or apprentices), and 2324 (liability as solidary or joint and divisible obligation).

No. 22-30248

61 F. Supp. 3d 609, 625 (E.D. La. 2014), which encompasses more than mere foreseeability if there is an ease of association, *see Todd*, 699 So. 2d at 39. But if no ease of association exists between the duty breached and the damages that occurred, there is no legal fault. *Roberts*, 605 So. 2d at 1045.

Guillot presented evidence of the following facts, which we will consider true: First, Powell was depressed on February 18, 2020, and stated he needed help. A doctor indicated that Powell seemed withdrawn and delusional, was not communicating well, and had wrist abrasions. On March 3, Powell falsely reported being raped and asked to be alone in his cell. On both of those occasions, the OCC nurse recommended that Powell see a mental health professional. Powell did not see a mental health professional and was not placed on suicide watch on either occasion, violating prison policies, per Guillot. On March 13, Powell committed suicide after speaking with OCC officials that day, indicating frustration with his cellmate. Guillot primarily focuses on the events of February 18, on which, she alleges, Powell "was found with cuts on his wrist and asking for help."

Yet the analysis does not change. The district court pointed to two cases to support its contention that there was no liability even under Louisiana state law. Plaintiff is correct that the first, *Misenheimer v. W. Baton Rouge Par. Sheriff's Office*, 95-2427 (La. App. 1 Cir. 6/28/96), 677 So. 2d 159, where an inmate grabbed a deputy's gun and shot himself, may not be entirely apposite. First, the prison had no history with the inmate and no reason beforehand to believe he was suicidal. *Id.* at 161–62. His grabbing the gun suddenly was not foreseeable, and the trial court made this determination after a trial, not at the summary judgment stage. *Id.*

But the second, *Leonard v. Torres*, is precisely on point. 2016-1484 (La. App. 1 Cir. 9/26/17), 2017 WL 4301898. A pretrial detainee hanged himself with his shoelaces, and his widow sued the sheriff and warden for failing to

prevent the suicide and failure to train. *Id.* at *1. The court found for the defendants, noting that "to show that a duty arose on the part of the prison officials, the evidence must establish that the prison authorities either knew or should have known of an inmate's suicidal tendencies." *Id.* at *3.

As analyzed before, officials did not have reason to believe that Powell was a suicide risk on March 13. He was not overly suicidal on that date and did not meet any OCC risk factors. Again, even if he had been suicidal on February 18 and March 3, that does not indicate OCC officials knew that he posed any risk of self-harm on March 13. As in *Leonard*, Powell did not vocalize any thoughts of suicide anywhere temporally near his suicide. Indeed, Guillot points to no case in Louisiana state courts where a court has ever accepted such a tenuous link for liability between a past mental health episode and an inmate suicide much later. Simply put, no ease of association exists here; defendants did not owe Powell a duty of care to place him on suicide watch on March 13, 2020.[16]

The summary judgment is AFFIRMED.

---

[16] Defendants bring other defenses, including that Guillot may not have appropriately raised her damages claims. Because she cannot prevail under the initial duty/risk analysis, it is not necessary to go further.