# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 21, 2024

Lyle W. Cayce
Clerk

———————

No. 23-30252

———————

Gretel Ann Carvell Jordan, *on behalf of minor children* H. A. A. W. and Z. M. W., *on behalf of* Misty Dawn Carvell Estate,

*Plaintiff—Appellant*,

*versus*

K. P. Gibson, *individually and in his official capacity*; Laura Breaux, *individually and in her official capacity*,

*Defendants—Appellees*.

————————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-1285

————————————————————————

Before Higginbotham, Higginson, and Duncan, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:[*]

This is an appeal from a grant of qualified immunity, on summary judgment, to Defendants-Appellees K.P. Gibson and Laura Breaux ("Appellees"), whom Gretel Ann Carvell Jordan ("Appellant") sued as a result of her daughter's death by suicide after she was placed in lockdown at the Acadia Parish Jail ("APJ") in 2019. Because Appellant's § 1983 and tort

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30252

law claims hinge on a plaintiff demonstrating that a defendant official had knowledge of a risk of suicide and disregarded that knowledge—and Appellant fails to make that showing here—we AFFIRM.

I.

Misty Carvell was arrested on September 27, 2019, for shoplifting at a Walmart and resisting arrest. She was arrested by the Crowley Police Department and then taken to the Acadia General Hospital for evaluation. In her complaint, Appellant alleges that Misty was taken to the hospital because she was "exhibiting signs of seizures and other symptoms of depression." According to her medical records from Acadia General Hospital, Misty was taken into triage at 9:03 P.M. after Crowley police officers brought her to the hospital because she "'started to have a seizure' after fighting with police" in front of the Walmart.

Misty arrived at the hospital "shaking [her] head only and speaking in [an] extremely slurred voice," and her treating physician noted that she had "facial redness" and an "abrasion to [her] right knee" due to her fight with the police. He further remarked that Misty falsely claimed she was 4-5 months pregnant, as she had done during a visit two months prior, even though she received negative pregnancy tests on both visits. The doctor also noted Misty's admitted history of pseudoseizures and that she had recently been seen for the same "pseudo-epileptic seizures."[1]

---

[1] Misty had been treated at the Acadia General Hospital on multiple other occasions for her seizures, including September 18, 2019, February 20, 2019, and August 4, 2016. Appellees' medical expert opined that "Dr. Baesler documented that the seizure-like episodes Ms. Carvell displayed in the Acadia Hospital ED were *not* consistent with real seizures" because she was not prevented from speaking during them. According to some medical literature, however, "pseudoseizure" does not refer to a fake seizure; "'psuedoseizure' is a now-outmoded term for paroxysmal events that appear to be epileptic seizures but do not arise from the abnormal excessive synchronous cortical

No. 23-30252

During her September 27, 2019 visit, Misty tested positive for MDMA, marijuana, amphetamines, and her prescription barbiturates.[2] The record of her physical exam noted of her psychiatric state: "[c]ooperative, appropriate mood & affect, normal judgment." Her clinical summary lists "Diagnoses This Visit" as "[m]edical problem – minor," "[n]oncompliance," "[p]olysubstance abuse," and "[p]seudoseizures," followed by a longer list of "[a]ctive" problems: hypertension, bipolar disorder, epilepsy, "[s]eizures drug-induced," suicidal ideation, major depression, amphetamine abuse, marijuana abuse, cocaine abuse, and methamphetamine abuse.

The doctor who examined Misty wrote that the Crowley Police Department brought her to the hospital "requesting us to clear patient for incarceration." She was medically cleared and discharged to the police at 10:17 P.M. on September 27, 2019. The hospital provided her with educational materials on substance use disorders and a standard discharge note, and she was instructed to follow up with a primary care provider within one to two days.

According to the declaration of Warden Jody Thibeaux, APJ records indicate that the Crowley police officers transported Misty to APJ on September 28, 2019. In her APJ intake form, dated 11:25 P.M. on September 28, 2019, Misty responded "yes" to each of the following questions: "Do you have any medical problems that need to be known during

_____

activity that defines an epileptic seizure." J. Stephen Huff *et al.*, *Psychogenic Nonepileptic Seizures*, *in* StatPearls, https://www.ncbi.nlm.nih.gov/books/NBK441871/ (last updated Feb. 25, 2024). However, the assertion by Appellees is that, while in APJ, Misty did fake a seizure so that she could have a phone call. In his incident report, medic Jon-Michael Guidry indicated that Misty was known for this behavior: "She has history of faking seizures immediately upon coming into jail."

[2] Misty was prescribed phenobarbital, a barbiturate, for her seizures.

incarceration?"; "Are you prescribed any medications or use medications?"; and "Do you use alcohol or street drugs?" On the same form, transporting officer Chad Hargrave had, at around 11:25 P.M., answered "no" to the question, "To your knowledge, has this arrestee used alcohol or drugs (prescription/narcotics/street drugs)?" In the section of the form filled out by the receiving officer, Raven Racca, Racca indicated that Misty did not lose consciousness, did not appear to be under the influence of drugs or alcohol, was not exhibiting behavior that "indicated[d] the danger or risk of suicidal behavior," and did not have any skin traumas marking drug use or obvious injuries or illnesses.

On September 30, 2019, Misty underwent an "Inmate Visual Assessment" in which an APJ deputy checked off "N[o]" answers for "Inmate appears to be under the influence of drugs or alcohol," "Visible signs of drug or alcohol withdrawal," "Inmate's behavior suggests the risk of suicide or assault," and "Inmate appears to have psychiatric problems." That same day, Misty saw another physician, who noted that her medical history included "pseudoseizures." The record indicated that she used substances—"[m]eth, [m]arijuana, Subutex"—but marked her mental status as "appropriate."

The most complete account of the lead-up to Misty's death came from Deputy Jon-Michael Guidry, an EMT at the jail who interacted with her multiple times in the day before her suicide. In an incident report dated October 4, 2019, Guidry wrote that on October 1, he was called to respond to a report of a woman having a seizure. Upon arriving to the prisoner's cell with a Sergeant Theriot, he wrote, Misty "immediately stopped 'seizing' and asked for a phone call." According to Guidry, he told her that he would give her a phone call when he had time. Later in the evening, at around 6:30 P.M., he responded to another seizure report in Misty's cell. He wrote that he took her to his office to evaluate her, and he found that she had normal

No. 23-30252

vitals. According to Guidry, Misty "stated that she was faking the seizures because she wanted a call and thought I forgot about her." After giving her a phone call, he placed her in lockdown for faking seizures, telling her that he would take her out of lockdown and let her use the phone again before he left work the next day.

Guidry wrote that he had scheduled for Misty to see a doctor on Wednesday, October 2, 2019, and that the doctor was "questioning the fact that she [wa]s even having seizures." Guidry did not write that he himself saw or interacted with Misty that day. However, he said that at around 6:45 P.M. he planned to make coffee and then "give Misty Carvell in Female LD [lockdown] a phone call and place her back in the tier." However, he wrote that at around 7:16 P.M., while he was at the coffee maker, a deputy called for a Sergeant Meaux to "come to Female LD." Guidry accompanied the officers to lockdown, where they found Misty hanging in bedsheets. He wrote that they made attempts to resuscitate her, but that she had no pulse and was not breathing. EMTs from Acadian Ambulance arrived to the scene at 7:23 P.M., where they attempted to resuscitate Misty for 30 minutes before discontinuing their efforts.[3]

In her sworn affidavit, Warden Thibeaux averred that no records indicated that Misty ever told any staff that she was suicidal while at APJ and that no records indicated that any APJ staff "suspected or had reason to suspect" that she was suicidal.

---

[3] There is a discrepancy here that is worth noting: Guidry's incident report says that he overheard the deputy call for Sgt. Meaux at approximately 7:16 P.M. and that then Guidry joined Meaux and the deputy in going to lockdown, where they found Misty. However, he also claims that he called Acadian Ambulance at 7:15 P.M. and that the ambulance arrived by 7:23 P.M. This exact timeline is impossible, as this would have required Guidry to call the ambulance before he arrived to lockdown and became aware that Misty had attempted suicide.

## II.

On October 1, 2020, Appellant brought this suit on behalf of Misty's estate against Laura Breaux, former Warden of the APJ, and K.P. Gibson, the Sheriff of Acadia Parish, in their individual and official capacities. Appellant sued under 42 U.S.C. § 1983, arguing that Breaux and Gibson violated Misty's constitutional rights by denying her medical care, and under Louisiana negligence law, arguing that they were independently and vicariously liable for her death under a *respondeat superior* theory. Appellees moved for summary judgment on all of Appellant's claims. On March 15, 2023, the district court issued an order granting summary judgment and entered judgment in favor of Appellees.

Appellant contends that the district court erred in granting summary judgment to Appellees where the evidence was sufficient to raise a genuine dispute of material fact as to 1) whether or not Appellees were deliberately indifferent to Misty's needs by inappropriately disciplining her and failing to monitor her, despite her documented erratic behavior, drug abuse, and suicidal ideation; 2) whether or not Appellees had an official custom, policy, or practice related to their failure to supervise individuals in isolation or their use of isolation as punishment; and 3) whether or not Appellees breached a state law duty to protect Misty from harm she might inflict upon herself.

## III.

"We review the district court's grant of summary judgment de novo, construing all facts and evidence in the light most favorable to the non-moving party." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015). Summary judgment is proper if the pleadings and the evidence gathered in discovery show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

IV.

Because the Plaintiff-Appellant has brought claims under federal and state law, we will analyze her federal claims before turning to her state law claims.

For lawsuits brought against public officials under § 1983, the Supreme Court has established the doctrine of qualified immunity. The doctrine aims "to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). When this immunity from suit is invoked, the summary judgment burden shifts from the public official-defendant—that is, the moving party on whom the burden traditionally rests—to the plaintiff. *Id.* at 329-30.

Qualified immunity has two prongs that a plaintiff must overcome to defeat summary judgment. First, the plaintiff must demonstrate that the actor claiming immunity violated the plaintiff's constitutional or statutory right. *Id.* at 329. Second, the plaintiff must show that the "violated right was 'clearly established' at the time of the alleged violation." *Id.* "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)

(internal quotation marks omitted) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, (2011)). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 63-64 (internal quotation marks omitted) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

In sum, when a public official makes a good-faith invocation of qualified immunity, it is the plaintiff's burden: (1) to demonstrate a genuine dispute of material fact and to show "that a jury could return a verdict entitling the plaintiff to relief for a constitutional [or statutory] injury," and (2) to show that the allegedly violated right was clearly established by "identify[ing] a case—usually, a body of relevant case law—in which an officer acting under similar circumstances . . . was held to have violated the Constitution." *Joseph*, 981 F.3d at 330 (ellipsis in original) (internal quotation marks omitted) (quoting *Wesby*, 583 U.S. at 64).

Appellant has also brought claims against Appellees in their official capacities, arguing that the APJ had a custom, policy, or practice of failing to check on inmates. "Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Liability for a municipality under § 1983 requires proof of three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Est. of Bonilla v. Orange Cnty.*, 982 F.3d 298, 308 (5th Cir. 2020) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Piotrowski*, 237 F.3d at 579. But it may also include "a persistent, widespread practice of City officials or

employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.), *on reh'g*, 739 F.2d 993 (5th Cir. 1984)).

However, a court need not consider *Monell* liability if it does not find an underlying violation. *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) ("As is well established, every *Monell* claim requires an underlying constitutional violation." (internal quotation marks omitted) (quoting *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 483 (5th Cir. 2014) (abrogated on other grounds))).

## V.

Plaintiff-Appellant's argument on appeal is that APJ officials should have known that her daughter was at risk of suicide due to the context surrounding her arrest, her behavior upon arrest, and her medical history as was reflected in the reports produced by the Acadia General Hospital:

> Neither Guidry nor any other Acadia Parish Jail officer ordered any particularized supervision or monitoring of Carvell, despite her erratic behavior, ongoing drug abuse, and documented medical history of major depression and suicidal ideation. The Defendants did not offer Carvell any detoxification services even though she was acting strangely and had originally presented to the Jail having recently abused methamphetamines, marijuana, and MDMA.

Appellant argues that, instead of supervising her, monitoring her, or offering her detoxification, Guidry "placed [Misty] in Lockdown in a cell which contained easily accessible loose bedding, including the bedsheet [she] later used to hang herself." Plaintiff-Appellant argues that Misty's "bizarre, uneven behavior," her entering jail while withdrawing from drugs, and her

medical history should have put Defendants-Appellees on notice that she had a heightened suicide risk.

An official acts with "deliberate indifference" when he is (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) "also draw[s] that inference." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In the jail-suicide context, officials breach their constitutional duties to the prisoners in their care when they "gain[] *actual knowledge* of the substantial risk of suicide and responded with deliberate indifference." *Edmiston v. Borrego*, 75 F.4th 551, 558-59 (5th Cir. 2023) (emphasis in original) (quoting *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020)).[4]

Previous rulings of this court emphasize the need for a plaintiff to show that the defendant had acquired specific knowledge that an inmate had attempted suicide, or was likely to do so—not just that the decedent was generally at-risk due to substance abuse or depression. In *Converse*, an official witnessed the decedent being pulled off a bridge after a suicide attempt and heard him express that he would make another attempt to do so. 961 F.3d at 776. In *Hyatt*, the decedent stated that he did not want to kill himself, but the official knew that the decedent suffered from depression, that he had recently attempted suicide, and that the decedent's wife believed him to be suicidal.

---

[4] In her briefing, Appellant discusses at length *Edmiston v. Culbertson Cnty.*, 580 F. Supp. 3d 411 (W.D. Tex. 2022). In that case, the district court denied qualified immunity at the motion-to-dismiss stage to officers who had placed an inmate in a cell with loose bedding even though the inmate had been acting erratically before his arrest and after he had arrived at jail. *Id.* at 427-28. But after Appellant submitted her brief, this court vacated the district court's ruling, holding that "allegations that [the decedent] told [his jailer] he had recently left a half-way house and may have abused drugs did not automatically impute knowledge to [the jailer] of a substantial risk of suicide." *Edmiston v. Borrego*, 75 F.4th 551, 561 (5th Cir. 2023).

843 F.3d at 178. In *Sanchez v. Oliver,* the defendant social worker took the decedent off of suicide watch even though the defendant had disclosed to her frequent suicidal ideation, self-harm (including an incident five days prior, in which auditory hallucinations had caused him to self-harm), and at least seven prior suicide attempts. 995 F.3d 461, 474 (5th Cir. 2021).

As to Appellant's assertion of Misty's "erratic behavior" and observable condition as someone withdrawing from substances, this court has observed that one "common thread" in cases dealing with deliberate indifference in the context of jail suicides "is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Est. of Bonilla*, 982 F.3d at 306. "[G]iven the varied, individualized nature of mental illness," courts have been reluctant to adopt such a sweeping proposition. *Id.*; *see also Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (noting that "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting").

Even if Misty behaved "erratically" by resisting arrest, lying about a pregnancy, and faking seizures, that is not enough under this court's precedent to suggest that APJ officials had subjective knowledge that she was at a heightened risk of suicide. The subtext in Appellant's briefing is that Misty had an ongoing relationship with the Crowley Police Department and the APJ sufficient for the officers and medics to be aware of her medical history and the potentially special risk that she had for suicide after her September 27 arrest. However, this is not the text—Appellant did not adduce evidence showing that the officers she encountered knew that she had attempted suicide earlier in the year, that she had told them she planned to commit suicide, or that they improperly filled out the forms to elide or erase knowledge of her depression and suicidal ideation. Like in *Edmiston*, the evidence of Misty's condition and what her jailers knew about it fails to show

that Misty "did or said anything to indicate [s]he was suicidal or otherwise intended to harm [her]self" or "that [her] prior or active drug use demonstrated to [Appellees] that [Misty] faced a substantial risk of suicide." 75 F.4th at 561.

Appellant also likens Misty's case to that of the decedent in *Shepard v. Hansford Cnty.*, 110 F. Supp. 3d 696 (N.D. Tex. 2015). In that case, a district court denied qualified immunity to jailers who put an inmate who was on suicide watch in a cell with a blanket, a towel, and a shower curtain, and the jailer who was supposed to be monitoring her via a video feed missed a 15-minute lead-up to her suicide in which she tied a towel around her neck and measured the towel against the bars of her cell. *Id.* at 703-05. This case is distinguishable from Misty's: the jailer in *Shepard* had subjective knowledge of the decedent's suicide risk because she was on suicide watch, and yet the jailer failed to follow the policy for monitoring her.

In this case, the record shows that two doctors and multiple officials at APJ encountered Misty from the period between September 27 and October 2, and that none of them reported that she suggested she might commit suicide or that she had indicated any specific inclination towards suicide, beyond her "erratic behavior" or her drug use. The unanimity of these forms and records indicates that Misty's jailers were not "deliberately indifferent" because there was not circumstantial evidence that Misty was at risk, specifically, for suicide. For the same reasons, Appellant's *Monell* claim that Appellees had a custom, policy, or practice of failing to supervise or monitor individuals in isolation "fail[s] without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013).

## VI.

Finally, we turn to Appellant's state law claim.

To prevail on a negligence claim in Louisiana, a plaintiff must show that "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 758 (5th Cir. 2023) (alteration omitted) (quoting *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1991)).

Under this duty/risk analysis, "a sheriff . . . owes a general duty to a prisoner to save him from harm and the officer is liable for the prisoner's injury or death resulting from a violation of such a duty." *Manuel v. City of Jeanerette*, 702 So. 2d 709, 712 (La. Ct. App. 1997) (citation omitted). This general duty "extends to protecting inmates from self-inflicted injury." *Misenheimer v. W. Baton Rouge Parish Sheriff's Off.*, 677 So. 2d 159, 161 (La. Ct. App. 1996).

"In examining the duty/risk in a particular case, state law requires an 'ease of association' between the injury/risk and the legal duty/rule of conduct," *Guillot*, 59 F.4th at 758. This is a "case-specific inquiry." *Id.* It encompasses the idea of foreseeability but also requires analyzing the duty imposed by the law along with the injury suffered by a plaintiff. *See Leonard v. Torres*, --- So.3d ----, No. 2016-1484, 2017 WL 4301898, at *3 (La. Ct. App. Sept. 26, 2017) ("Prison officials owe prisoners a duty to prevent self-inflicted harm that is reasonably foreseeable."); *Scott v. State*, 618 So.2d 1053, 1059 (La. Ct. App. Apr. 23, 1993) ("[P]rison authorities owe a duty to use reasonable care to protect inmates from harm and this duty extends to protecting inmates from self-inflicted injury. This duty is not absolute, but depends upon the circumstances of the particular case.").

The district court did not err in its holding that Appellant did not produce evidence suggesting that jail officials knew or should have known that Misty was a danger to herself. Appellant cites *Manuel*, in which a Louisiana state appeals court affirmed a finding, following a bench trial, that the City of Jeanerette was negligent in supervising an incarcerated decedent who committed suicide in its care. *Manuel*, 702 So. 2d at 711. Appellant is correct that, in that instance, the decedent was behaving erratically but did not indicate to his jailers that he had suicidal ideation. But in that case, other prisoners testified that the decedent "called for help a few times and the dispatcher did not respond," and a prisoner in the cell next door testified that he "heard a gasping sound coming from the prisoner in cell two . . . and that he yelled for the dispatcher to check the prisoner but she did not respond." *Id.* at 711-13. The court held that the dispatcher had breached her duty by "not checking on him once" while he was in the cell overnight, even when she heard his bunk turn over or when the prisoner next door said he heard him gasping. *Id.* at 713. In that case, then, the state court found liability appropriate because a prison official could have aided him in the two to five minutes he laid dying in the cell but failed to do so—not because the official failed to link his erratic behavior to a risk of suicide.

The facts of this case more closely parallel those of *Leonard*, in which a widow sued the sheriff and warden of Pointe Coupee Parish after her husband, who was in a holding cell awaiting booking, committed suicide by hanging himself with his shoelaces. *Leonard*, 2017 WL 4301898, at *1-2. The court held that prison officials had not breached their duty to the decedent because he "never expressed any suicidal thoughts or ideations to any employees of the sheriff's office, nor did the employees have notice or should have had notice that [he] may have had suicidal tendencies or ideations." *Id.* at *5. Similarly, in *Guillot*, this court rejected a plaintiff's state law claims on behalf of her son, whose alleged father committed suicide in the Ouachita

No. 23-30252

Correctional Center ("OCC") after having twice been placed on, and released from, suicide watch during the four months prior. *Guillot*, 59 F.4th at 748. Because "[decedent] did not vocalize any thoughts of suicide anywhere temporally near his suicide," defendants did not breach any duty to put him on suicide watch on the day that he killed himself when he "did not meet any OCC risk factors." *Id.* at 759.

These cases demonstrate that Appellant's claim under state law falters for the same reason the constitutional violation claims fail: the evidence presented at summary judgment did not create a genuine issue of material fact as to whether jail officials had knowledge that Misty planned to attempt, or was considering, suicide. There were no instances in the record in front of the district court that Misty told medical professionals with whom she visited, or her jailers, that she was experiencing suicidal ideation; nor did her generally erratic behavior or drug use put them on notice of suicidal tendencies. Without this kind of evidence, Appellant cannot make a showing that APJ officials breached their duty of care.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is AFFIRMED.